[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 571.]

WRIGHT, APPELLANT, *v.* HONDA OF AMERICA MANUFACTURING, INC.,
APPELLEE.

[Cite as *Wright v. Honda of America Mfg., Inc.*, 1995-Ohio-114.]

*Contracts—Employment relations—Evidence that trier of fact may consider in deciding factual issue of whether an employment-at-will agreement has been altered by an implied agreement—Civil procedure—Depositions— When deponent reviews deposition testimony under Civ.R. 30(E) and makes changes in form and substance of such deposition testimony, original testimony as well as the change remains in the record.*

When a deponent reviews his or her deposition testimony under Civ.R. 30(E) and makes changes in the form and substance of such deposition testimony, both the original testimony as well as the changes remain in the record and are to be considered by the trier of fact.

(No. 94-982—Submitted May 24, 1995—Decided August 30, 1995.)

APPEAL from the Court of Appeals for Logan County, No. 8-93-24.

———————

{¶ 1} This appeal stems from a lawsuit brought by Melissa Wright, appellant, against Honda of America Manufacturing, Inc. ("Honda"), appellee, challenging Honda's decision to terminate her for violating its anti-nepotism policy. Appellant alleged in her complaint that there was an express or implied contract of employment between herself and Honda, and that Honda breached this contract, and/or was estopped from terminating her. Honda filed a motion for summary judgment asserting that appellant was an employee-at-will and that it was free to terminate her. The trial court granted summary judgment in favor of Honda. The court of appeals affirmed.

**{¶ 2}** The following facts underlying appellant's discharge were before the trial court in the summary judgment proceeding. The depositions, affidavits and exhibits reveal that in January 1984, Wright applied for a position of employment with Honda. She was hired and subsequently started work in August 1984. Six to eight weeks after beginning work, Wright learned that her half-brother, with whom she had had little contact, had been working for Honda in a different department prior to the time she accepted her position. It was also at this time that Wright said she became aware that Honda had in effect an anti-nepotism policy.

**{¶ 3}** Wright was concerned and phoned a friend in management for advice and clarification of this policy. Wright was told that there were other cases of relatives working together and not to worry about the situation concerning her half-brother. Wright also reviewed the Honda Associate Handbook, which management referred to in orientation as the "Honda bible," and found that the handbook contained a provision which states that it is Honda's policy to transfer family members who worked within the same department rather than terminate an employee under these circumstances. Thus, appellant felt confident that there was no problem. In 1988, a Honda supervisor reinforced this feeling when he told Wright that he was aware that her half-brother also worked for Honda but that she need not be concerned.

**{¶ 4}** For the next seven years, Wright demonstrated that she was an exemplary and loyal employee. She was promoted twice and received two perfect attendance awards as well as a number of manager awards. Wright received high praise in progress reports and was described by her superiors as an employee who showed a willingness to accept tasks.

**{¶ 5}** Wright continued working and excelling in her job at Honda without incident until July 17, 1991, at which time she was called into a meeting with one or two supervisors and the administrative manager of the plant, Sandra Sue Boggs. Boggs questioned Wright about her half-brother and also asked Wright whether she

was aware of Honda's anti-nepotism policy, which she said prevented the hiring of "direct relatives."[1] Wright admitted that her half-bother worked for Honda, but said that when she interviewed for a position with the company she was never questioned about having any direct relatives and was not told that Honda had an anti-nepotism policy. In fact, it appears that she did not become aware of this policy until after she was hired.[2] Boggs told Wright to go home and that management would investigate the matter and call her the next day to let her know whether she could return to work.

**{¶ 6}** Rather than contact her the next day, Boggs called Wright that same afternoon at 5:00. According to Wright, Boggs told her that Honda had made a mistake and that she should come back to work the next day as if nothing had happened. Boggs disputes telling Wright this, but instead recalls advising Wright that she would not be terminated at that time.

**{¶ 7}** Wright states that she returned to work the next day and was told by her supervisor that "[i]t's over," and that what happened does not affect the way management feels about her or her work. Wright believed that the matter was closed and worked for over a month without any mention of the July meeting. However, on August 27, 1991, Wright was called into another meeting with management. Wright was told that management had discovered a "check sheet" from her initial interview with Honda, which confirmed by check mark that Wright was asked about direct relatives during her interview. Boggs also told Wright that Frank Henry, the man who had interviewed her, verified this information. However, Henry did not recall his interview with Wright and could not confirm the

---

1. Honda defines "direct relatives" as parents, children, spouses, brothers, sisters, half-brothers, half-sisters and grandparents.

2. At this interview, Wright admits that she may have told management that she first learned about this policy at orientation. However, according to her deposition testimony and affidavit, she said that she really became aware of this policy at a later time, in October 1984.

fact that he had made the check mark by Wright's name which would indicate she was asked about direct relatives.[3] Wright was then terminated for violating the company's anti-nepotism policy.

{¶ 8} Following the court of appeals' affirmance of appellee's motion for summary judgment, appellant appealed to this court. The cause is now before this court pursuant to the allowance of a discretionary appeal.

———————————

*Cloppert, Portman, Sauter, Latanick & Foley, Grant D. Shoub* and *Charles J. Smith*, for appellant.

*Vorys, Sater, Seymour & Pease, Mary Ellen Fairfield* and *Ellen L. Seats,* for appellee.

*Stewart Jaffy & Associates Co., L.P.A., Stewart R. Jaffy* and *Marc J. Jaffy,* urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Spater, Gittes, Schulte & Kolman* and *Frederick M. Gittes*; and *Louis A. Jacobs*, urging reversal for *amicus curiae*, Ohio Employment Lawyers Association.

———————————

**FRANCIS E. SWEENEY, SR., J.**

{¶ 9} In this appeal, we must decide whether this was an appropriate case for summary judgment. To answer this question, we need to determine whether appellant is an employee-at-will, as the lower courts found, or whether there exists a genuine issue of material fact to support appellant's position that there was an implied contract of employment which limited appellee's right to terminate her.[4] For the following reasons, we find that summary judgment was inappropriate, as sufficient evidence was presented to rebut the employment-at-will presumption and

---

3. Subsequently, Honda developed a form in which it asked associates to confirm in writing that they had no direct relatives working for Honda. Wright was never asked to sign such a form.
4. Although appellant also claims that promissory estoppel is applicable, we believe that the implied contract exception to the employment-at-will doctrine is pertinent to this case.

to raise a genuine issue of material fact as to whether an implied employment agreement exists. Consequently, we reverse the judgment of the court of appeals and remand this cause to the trial court.

{¶ 10} In general, under the employment-at-will doctrine, the employment relationship between employer and employee is terminable at the will of either; thus, an employee is subject to discharge by an employer at any time, even without cause. See *Henkel v. Educational Research Council of Am.* (1976), 45 Ohio St.2d 249, 255, 74 O.O.2d 415, 418, 344 N.E.2d 118, 121-122. However, in *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 104-105, 19 OBR 261, 264-265, 483 N.E.2d 150, 154-155, we first recognized the harshness of this rule and carved out two exceptions to the employment-at-will doctrine: (1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee.

{¶ 11} In *Mers*, we recognized that in order to ascertain the explicit and implicit terms concerning discharge in an oral employment agreement, it is important for the trier of fact to review the history of relations between the employer and employee and the "facts and circumstances" surrounding the employment-at-will relationship. These "facts and circumstances" include the "the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question ***." *Id.* at 104, 19 OBR at 264, 483 N.E.2d at 154.

{¶ 12} Today we take the opportunity to decide what other facts and circumstances can be considered by the trial court. Thus, in order to overcome a summary judgment motion and to raise a factual issue as to whether an employment-at-will agreement has been altered by an implied agreement, the trier of fact can consider, in addition to the facts and circumstances set forth in *Mers v. Dispatch Printing Co., supra*, such evidence, which includes, but is not limited to,

that information contained in employee handbooks, oral representations made by supervisory personnel that employees have been promised job security in exchange for good performance, and written assurances reflecting company policy.

{¶ 13} In this case, in response to appellee's summary judgment motion, appellant submitted an array of evidence to raise a factual issue that an implied employment agreement existed in which appellant could not be terminated unless she failed to perform her job adequately. Beginning at orientation, Honda stressed to its employees the importance of attendance and performing quality work. The expectation of continued employment based upon these principles was further reinforced by language contained in Honda's Associate Handbook. For instance, Part V of the handbook provides that "[t]he job security of each of you depends on you doing your very best on your job with the spirit of cooperation." Although employee handbooks are not in and of themselves a contract of employment, they are nevertheless evidence of the employment contract. *Kelly v. Georgia-Pacific Corp.* (1989), 46 Ohio St.3d 134, 139, 545 N.E.2d 1244, 1249.

{¶ 14} Progress reports and promotion letters also stressed appellant's "continued growth" with the company and future opportunity "to help [Honda] achieve the goal of becoming the best place to work in the motor vehicle industry." In further evidence, appellant's supervisor commented in a progress report that appellant was destined "to go as far as she wants to if she has the ability to maintain her good work ethic and determination." Thus, based upon Honda's oral and written assurances that good attendance and quality work were linked to job security, Wright believed that if she attained these goals and performed her job well, she could expect continued employment with the company.

{¶ 15} There is also evidence that management believed that this was Honda policy. Susan Boggs, the person who was ultimately responsible for terminating appellant, testified by deposition that if an employee performs his or her job in an acceptable manner and does not violate any practices of the company,

the employee can expect to have continued employment with Honda. Boggs later "clarified" this response, upon review of her transcribed deposition, by stating that Honda does not promise continuous employment to any associate. The fact that Boggs changed her response does not mean that her original testimony should be ignored. Instead, when a deponent reviews his or her deposition testimony under Civ.R. 30(E)[5] and makes changes in the form and substance of such deposition testimony, both the original testimony as well as the changes remain in the record and are to be considered by the trier of fact. See *Lugtig v. Thomas* (N.D.Ill.1981), 89 F.R.D. 639.[6]

{¶ 16} Furthermore, Honda's course of dealing with appellant regarding her alleged violation of its anti-nepotism policy reinforced appellant's belief that she could expect job security. According to appellant, when she was interviewed, she was neither asked about direct relatives nor told that Honda has an anti-nepotism policy. Once she became aware of such a policy, she was told by two individuals in management that she had no reason to be concerned and that there were other employees who retained their positions under similar circumstances. Based upon these assurances and upon her reliance on the Associate Handbook, which called for the transfer, not termination of, direct relatives, appellant felt secure and continued to work diligently for Honda.

---

5. Civ.R. 30(E) provides: "When testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. ***"

6. We note that other Honda deponents, in reviewing their deposition answers, made substantive changes on key points, apparently to bolster Honda's position that appellant is nothing more than an employee-at-will. These substantive changes in deposition testimony bring the credibility of these deponents into play, which is another reason why summary judgment is inappropriate. See *Turner v. Turner* (1993), 67 Ohio St.3d 337, 617 N.E.2d 1123, paragraph one of the syllabus.

{¶ 17} Honda claims that its anti-nepotism policy clearly calls for the termination of an employee once it is discovered that the employee was asked and answered the question of whether he or she has any direct relatives employed by the company. Relying on the interview check sheet as proof that appellant was asked this question, Honda states that it terminated her. Honda concedes that it did allow some "direct relatives" to slip through the cracks as the time of its original mass hiring, but says this was not the case when appellant was hired. Thus, according to Honda, the transfer provision in the employee handbook applies only to this small number of employees who were hired at the time of the mass hiring.

{¶ 18} Certainly, this dispute in facts surrounding appellant's termination can only be resolved by the trier of fact. Nevertheless, we find that the manner in which Honda terminated appellant cannot be condoned. Particularly egregious is that Honda chose to bring appellant back to work the day after she was ordered home, permitted her to work for a month, and then terminated her. Whether this is routine procedure as Honda suggests belies the point if, in construing the evidence in appellant's favor, we accept as true that appellant was told that Honda had made a mistake in sending her home and that the matter was closed.

{¶ 19} Honda's president, in his message to employees, states in the Associate Handbook the following: "The management policy of Honda of America has at its core the belief that the human being is the most important asset in a manufacturing operation. Under this policy, each of you is to be treated fairly, equally, and with respect." Unfortunately, Honda has failed to practice what it preaches. Instead, Honda has made a mockery of this well-meaning message by terminating appellant, a loyal, hard-working employee who intended to make Honda her career employer, in the manner described.

{¶ 20} We are persuaded that appellant has presented sufficient evidence to create a fact question as to whether Honda, through its policies, past practices and representations altered the at-will nature of the employment agreement by creating

an expectation of continued employment. Consequently, under Civ.R. 56(C), since the facts are subject to reasonable dispute, the matter should not have been disposed of by a motion for summary judgment. Instead, the merits of appellant's claims should be decided at trial. *Jackson v. Kings Island* (1979), 58 Ohio St.2d 357, 360, 12 O.O.3d 321, 323, 390 N.E.2d 810, 813.

{¶ 21} We find that the court of appeals erred in affirming the grant of summary judgment for Honda. Accordingly, the judgment of the court of appeals is reversed and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

*Judgment reversed*
*and cause remanded.*

DOUGLAS and RESNICK, JJ., concur.

MOYER, C.J., WRIGHT and PFEIFER, JJ., concur in the sullabus and judgment.

COOK, J., dissents.

———————————

**MOYER, C.J., concurring.**

{¶ 22} I concur in Justice Pfeifer's separate concurrence, except the discussion regarding anti-nepotism policies.

WRIGHT, J., concurs in the foregoing concurring opinion.

———————————

**PFEIFER, J., concurring in judgment and in the syllabus.**

{¶ 23} I concur with the majority that summary judgment was inappropriate in this case, but do so for mostly different reasons. The only facts relevant to whether there was an employment contract between Wright and Honda are those facts concerning a specific term or condition of employment. Among the factors cited by the majority, only Honda's words and actions concerning its nepotism policy could have created an implied contract between Wright and Honda. That

contract would be limited to a specific term of employment, *i.e.*, that Wright would not be terminated simply because she had a half-brother who also worked at the huge manufacturing facility.

{¶ 24} I do not concur that the other factors cited by the majority can give rise to an implied contract. Corporate cheerleading calculated to build an "*esprit de* corporation" is a motivational device designed to increase productivity by making workers feel as though they are an important part of a team. A corporate desire to make employees feel appreciated does not transform those employees into something other than at-will employees. Therefore, inspirational orientation remarks, employee handbook platitudes, bright-eyed promotion letters, and complimentary progress reports, all lacking any direct promise of continued employment or reference to terms of employment, do not imply a contract between an employer and an employee.

{¶ 25} A genuine issue of fact exists as to whether a limited implied contract existed between Wright and Honda, such that Honda agreed not to terminate Wright because a relative also worked at Honda. There is testimony that someone in management told Wright that there were other cases of relatives working together at Honda with no repercussions, and that Wright should not worry about the situation. Wright's employee handbook also stated that Honda's policy was to transfer relatives who worked in the same department to other departments. Also, a Honda supervisor apparently told Wright in 1988 not to worry about the situation with her half-brother.

{¶ 26} The most egregious facts occurred in 1991, when Wright was sent home from work one day for violating the anti-nepotism policy, but was called later that day by the plant's administrative manager and was told that Honda had made a mistake and that she should come back to work as though nothing had happened. A little more than a month later, Wright was fired for violating Honda's anti-nepotism policy.

{¶ 27} All of those instances which directly referred to specific terms of employment, from supervisors' comments, to employee handbook statements, to the original decision not to fire Wright, could be used to determine that a limited implied contract existed between Wright and Honda.

{¶ 28} Therefore at trial, Wright should be given a chance to prove the existence of an implied contract. Still, while Wright has succeeded here today, the real battle should focus on the questionable merits of anti-employment anti-nepotism policies. Employer anti-nepotism policies can be just as pernicious as other prohibited forms of discrimination, since they have nothing to do with an individual's merit. Does a relative's job have any more to do with the one's ability to perform than does one's race, creed, color, or sex?

{¶ 29} At Honda, as with all employers from supermarkets to law firms, other internal controls should already exist to deal with any perceived problems of nepotism. There are less onerous ways to protect corporate integrity than a blanket anti-employment anti-nepotism policy. Instead, in this case, Ohioans are deprived of the opportunity to be employed at a major regional employer because they may share some common blood with another worker.

———————————

**COOK, J., dissenting.**

{¶ 30} I respectfully dissent from the opinion and judgment of the majority. Like the court of appeals, I would affirm the summary judgment in favor of Honda because the circumstances surrounding Wright's employment did not clearly manifest that the parties intended to bind each other in a manner different from the strongly presumed relationship of employment-at-will. Wright's summary-judgment evidence presented on her theory of implied contract fell short of showing the elements of contract: an intent by Honda to be bound, a meeting of the minds, a bargained-for exchange, and consideration supporting modification of the at-will status.

{¶ 31} In my view, not one of the statements or writings from Honda, or the cumulative impact of those communications, suffices to alter the at-will nature of Wright's employment to that of an implied contract to discharge only for just cause. First, Honda's distribution of a handbook stressing the importance of attendance and quality work should not be elevated to evidence of a "meeting of the minds" sufficient to alter the admittedly at-will status of Wright's hiring. Second, any rational employer would agree with the statement made by Susan Boggs in her deposition that "if somebody is performing their job in an acceptable manner *** [and does not] violate any practices of the company ***[,] they can expect to have continued employment." Such expectation of an employee, however, should not be deemed sufficient to raise an issue of fact as to whether or not the employee and employer entered into a contract by implication. Likewise, the handbook language providing that "[t]he job security of each of you depends on your doing your very best on your job with the spirit of cooperation" cannot reasonably be considered a promise to all Honda employees that they may be discharged only for just cause. In fact, it may be read just as easily as a warning about the potential for discharge for subjective reasons. The president's message regarding the management policy to treat employees "fairly, equally, and with respect" is not put in terms of a legal

contract. At most, it is an expression of goodwill. Finally, Wright's positive evaluations referencing "continued growth" with the company and comments on her destiny to "go as far as she wants to" with the company are not inconsistent with at-will employment.

{¶ 32} As for the anti-nepotism-rule issue, Wright does not argue it in support of her implied contract claim. The anti-nepotism rule is of no consequence unless Wright has an implied contract to be discharged only for cause. If Wright could have proved she had this implied contract to be discharged only for cause, the breach of the anti-nepotism rule could serve as "just cause" for her termination. She, therefore, needed to produce evidence that the anti-nepotism rule was waived as to her. Wright's evidence that certain managers assured her that she need not be concerned about being in violation of the anti-nepotism rule and that she was called back to work after being told to go home is not additional evidence of a contractual right to employment, as the majority utilizes it. Instead, it related only to whether the rule could be enforced against her, thereby rendering her discharge lawful *even if* she established that she had an employment contract with Honda.

{¶ 33} Moreover, Wright's evidence on the waiver issue should not have withstood summary judgment. Wright acknowledged that, upon discovery that she might be in violation of the anti-nepotism rule, she did not ask questions of her supervisor or an Associate Relations representative as the handbook advised. Instead, outside work, she phoned a friend whose husband was a coordinator in another Honda department. Through his wife, this coordinator told Wright "not to worry about it." Neither this statement nor the one allegedly made by another coordinator was claimed to have been made in an official capacity. Accordingly, even if the issue of waiver were not rendered moot by the conclusion that Wright was an at-will employee (and therefore could be terminated for any reason), Wright failed to come forward with evidence sufficient to raise a material-fact issue as to whether Honda waived its right to enforce the rule against her.

{¶ 34} For the foregoing reasons, I would affirm the judgment of the court of appeals upholding summary judgment in favor of Honda.

_____