Robert E. BICKLEY, Jr., Plaintiff,

v.

FMC TECHNOLOGIES, INC., Defendant.

No. 3:02 CV 7212.

United States District Court, N.D. Ohio, Western Division.

Sept. 4, 2003.

Suzanne M. Nigro, Cleveland, OH, for Robert E. Bickley, Jr.

David A. Kadela, Littler Mendelson, Columbus, OH, for FMC Technologies, Inc., dba Stein–DSI.

## ORDER

CARR, District Judge.

Plaintiff Robert E. Bickley brings this suit against defendant FMC Technologies, Inc. ("FMCT"), alleging claims under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and state common law claims of malicious prosecution, abuse of process, breach of implied contract, and public policy wrongful discharge. FMCT counterclaims alleging tortious interference with its business. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. Pending are motions by both parties for summary judgment on each other's claims. For the following reasons, defendant's motion shall be granted and plaintiff's motion shall be denied.

## FACTUAL BACKGROUND

FMCT owns and operates Stein DSI ("Stein"), a manufacturer of food processing equipment in Sandusky, Ohio.

In 1995, plaintiff began working at Stein as a welder. By 1999, plaintiff worked the second shift (3:30 p.m. to 1:30 a.m.) four days a week.

In 1997, plaintiff was seriously ill with a kidney aneurysm and was off work for several weeks. In October, 1999, plaintiff claims he began experiencing symptoms similar to those he had in 1997. On Wednesday, October 20, 1999, plaintiff told his group leader and immediate supervisor, Dean Hershiser, that he had to leave work early because of kidney symptoms.

According to plaintiff, he saw his physician the following day, Thursday, October 21. She prescribed antibiotics and scheduled tests for Friday, October 22. After the appointment on Thursday, plaintiff claims he telephoned Bob Bell, Hershiser's supervisor, to inform Stein management that he would not be returning to work until his physician determined what was wrong with him.

On Monday, October 25, plaintiff's physician informed him that the tests for another kidney aneurysm were negative and that he may have had an infection. She signed a note to Stein stating that plaintiff was under her care from October 20, 1999, to October 25, 1999, and that plaintiff was able to return to work on Tuesday, October 26.

Plaintiff returned to work on Tuesday, October 26. He gave the doctor's note to

human resources manager Chris Roggeman.

Plaintiff alleges that his timecard had been marked "unexcused." When he approached Bell and Hershiser, plaintiff claims they responded, "Well, that's what you get when you go over somebody's head, you get slapped down like a [expletive] dog." Bickley Depo. at 183.

A few days later, on November 2, 1999, the Sandusky Police Department received a bomb threat 911 call at approximately 6:45 p.m. The caller alleged: "Stein Incorporated is going to blow up in the next 24–hours." Sandusky police traced the call to a pay phone at Stein. Police Sergeant Michael Campbell and Officer Major Ruffin went to the facility to investigate the call.

Campbell and Ruffin asked human resources manager Roggeman to listen to a tape of the 911 call to see if she could identify the voice of the caller. Roggeman identified the voice as that of the plaintiff. Roggeman then asked the manufacturing manager, Dave Bertsch, to listen to the tape, telling him that the caller sounded like the plaintiff. Bertsch also identified plaintiff's voice. Plaintiff's immediate supervisor, Dean Hershiser then listened to the tape without being advised that plaintiff had been implicated. Hershiser also identified plaintiff as the caller.

Plaintiff was thereafter arrested and charged with the felony of inducing panic.

On November 3, 1999, Stein human resources director, Peter FitzGibbon, after consulting with the Stein President and the operations director, suspended plaintiff without pay pending an investigation of the bomb threat.

As part of FitzGibbon's investigation, defendant claims that two Stein employees placed plaintiff in the vicinity of the pay phone around the time the 911 call was placed. Jeff Sosa claimed that around 6:40 p.m., he received a page from North Central EMS, his other employer. He then proceeded to the pay phone to call North Central and returned to his work area after making the call around 6:45 p.m. On his return, he allegedly saw plaintiff walking toward the phone. Another employee, Tim Forrest, claimed that while walking to the restroom around 6:45 p.m., he saw plaintiff at the phone, but not on it. After Forrest left the restroom, he claims he noticed plaintiff standing in a hallway near the phone.

In a letter date December 17, 1999, Stein terminated plaintiff.

On February 11, 2000, a grand jury indicted plaintiff on the charge of inducing panic. On May 4, 2001, a jury acquitted plaintiff in the Erie County Common Pleas Court.

## PROCEDURAL BACKGROUND

In April, 2002, plaintiff filed this lawsuit alleging violations of the FMLA and common law claims of malicious prosecution, abuse of process, breach of an implied contract, and wrongful discharge. FMCT counterclaimed for tortious interference with its business.

In a previous order, I granted defendant's motion for summary judgment as to plaintiff claims under the FMLA. I also dismissed the pendant state law claims without prejudice. The parties thereafter filed a joint motion to reconsider, requesting the court to decide the state law claims. The parties declared that they were diverse and the amount in controversy exceeded $75,000, and, therefore, this court had jurisdiction over the state law claims. These facts were not alleged in the complaint. Accordingly, I granted the parties' motion subject to the plaintiff's filing of an amended complaint making clear its basis of diversity jurisdiction.

Pending are motions for summary judgment on all state law claims. Also pending are motions by both parties to strike portions of affidavits and other documentary evidence.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party,

and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

### I. Plaintiff's Claims

#### A. Malicious Prosecution

 The tort of malicious criminal prosecution is the right to recover damages for the harm caused to a defendant in a criminal case by the misuse of criminal actions. *Trussell v. General Motors Corp.*, 53 Ohio St.3d 142, 146, 559 N.E.2d 732 (1990). To make out a claim of malicious prosecution, a plaintiff must prove three elements: "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the defendant." *Id.*

 The requirement of malice turns directly on the defendant's state of mind. "Malice is the state of mind under which a person intentionally does a wrongful act without a reasonable lawful excuse and with the intent to inflict injury or under circumstances that the law will imply an evil intent." *Criss v. Springfield Township*, 56 Ohio St.3d 82, 84–85, 564 N.E.2d 440 (1990) (citing Black's Law Dictionary 956 (6th ed.1990)). For purposes of malicious prosecution "it means an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Id.*

■ There is no evidence in the record that defendant instituted or continued plaintiff's criminal prosecution with an improper purpose. The police asked employees of the defendant to identify the voice on the 911 call. After Roggeman, Bertsch, and Hershiser identified the voice as that of plaintiff, the police and prosecutor's office determined to take action against the plaintiff. Thus, defendant only provided information in response to requests from the prosecutor. As the Supreme Court of Ohio held in *Archer v. Cachat,* 165 Ohio St. 286, 135 N.E.2d 404 (1956):

> Where a private person gives to a prosecuting officer information which he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in this section even though the information proves to be false and his belief therein was one which a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings

*Id.* at 287, 135 N.E.2d 404.[1]

Plaintiff claims that defendant maliciously withheld information from the prosecutor that demonstrated plaintiff was not the 911 caller. Specifically, plaintiff alleges that Hershiser did not inform the investigators that he did not see plaintiff walk by his desk. This, according to plaintiff, Hershiser would have seen him if he were going to the pay phone. Additionally, plaintiff argues that defendant maliciously targeted Bickley as the culprit of the 911 call because he was a "perceived troublemaker." Doc. 37 at 39.

Plaintiff does not provide any authority for the proposition that because Hershiser did not voluntarily provide such information to the police, he maliciously instituted the criminal proceedings. Moreover, simply because Hershiser did not see Bickley leave the area does not mean Bickley could not have made the call. *See* Bickley Dep. at 179, 259–60. Similarly, there is no evidence—besides plaintiff's self-serving affidavit and testimony—that employees of defendant had a motive to lie regarding Bickley's voice on the tape.[2] Thus, plaintiff provides no evidence that defendant maliciously instituted or continued plaintiff's prosecution.

■ Plaintiff also cannot a create a question of fact on the probable cause element. In Ohio, probable cause exists when "a defendant had a reasonable ground of belief, supported by trustworthy information and circumstances known to the defendant which would be suffi-

---

1. *See also* 45 Ohio Jurisprudence, *False Imprisonment and Malicious Prosecution* § 76 ("Where the defendant states the bare facts as to the conduct of a third person to a judicial officer or prosecuting attorney, and the latter erroneously deems a crime to have been committed, and directs the third person's arrest, the informer is not liable to the person arrested for malicious prosecution; it is the officer's error, rather than the defendant's acts, which is the cause of the plaintiff's injury.").

2. Several courts have declared that "self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001) (citation omitted); *see also Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Syvongxay v. Henderson,* 147 F.Supp.2d 854, 859 (N.D.Ohio 2001); *Wolfe v. Village of Brice,* 37 F.Supp.2d 1021, 1026 (S.D.Ohio 1999) ("Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment.") (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995))

ciently strong to cause a reasonable careful person, under similar circumstances, to believe that the prior proceedings and method of presenting the action were reasonable and lawful." *Deoma v. Shaker Heights,* 68 Ohio App.3d 72, 77, 587 N.E.2d 425 (1990) (citations omitted). There is no requirement that the defendant must have evidence that will ensure a conviction. *Id.* (citing *Epling v. Express Co.,* 55 Ohio App.2d 59, 62, 379 N.E.2d 239 (1977)).

The return of an indictment by the grand jury establishes probable cause. *Id.* (citing *Donohoe v. Burd,* 722 F.Supp. 1507, 1517 (S.D.Ohio 1989)) ("[W]hen an indictment has been returned by the grand jury, the plaintiff has the burden of producing substantial evidence to establish lack of probable cause."). *See also Adamson v. May Co.,* 8 Ohio App.3d 266, 268, 456 N.E.2d 1212 (1982); *Epling,* 55 Ohio App.2d at 60, 379 N.E.2d 239 ("Plaintiff must produce evidence to the effect that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular.").

 Plaintiff has no evidence—other than self-serving speculation—that defendant had no reasonable ground to believe the criminal proceeding was lawful. There is no evidence that Roggeman, Bertsch, or Hershiser lied in reporting that it was plaintiff's voice on the 911 tape.[3] There is also no evidence that the grand jury proceedings were irregular. Even if there were a fair likelihood that identification of the plaintiff's voice by company officials were erroneous, that possibility is immaterial. Absent the evidence that plaintiff has failed to provide, his acquittal at trial does not undo the grand jury's finding of probable cause.

Thus, because plaintiff has not produced evidence of malice or a lack of probable cause, no reasonable juror could find defendant liable for the tort of malicious prosecution. Defendant's motion for summary judgment as to this claim shall therefore be granted.

## B. Abuse of Process

 The tort of abuse of process was developed for " 'cases in which legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but nevertheless has been perverted to accomplish an ulterior purpose for which it was not designed.' " *Yaklevich v. Kemp, Schaeffer & Rowe,* 68 Ohio St.3d 294, 297, 626 N.E.2d 115 (1994) (citing Prosser & Keeton, *The Law of Torts* § 21 (5th ed.1984)). The elements of the tort are: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful process." *Id.* at 298, 626 N.E.2d 115.

---

**3.** Plaintiff claims the affidavit statements of Roggeman, Bertsch, and Hershiser describing the 911 voice identification should be stricken because the affiants lacked personal knowledge and foundation and because the statements are prejudicial. As I explained in my previous order, plaintiff's motion is overruled. Moreover, such evidence may be admissible in deciding a malicious prosecution case. As the Supreme Court of Ohio explained in *Criss:*

Frequently a police investigation will uncover evidence which may not be admissible in a criminal trial. Yet that inadmissible evidence can and often should be evaluated in deciding whether to prosecute. Examples include the results of a faulty search and seizure, hearsay, technically flawed confessions, and witness statements. Though not admissible in the criminal trial, such evidence may have relevance in showing whether the decision to prosecute was undertaken maliciously.

56 Ohio St.3d at 85, 564 N.E.2d 440.

Accordingly, "there is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* at 298 n. 2, 626 N.E.2d 115 (citing Prosser & Keeton, *supra,* at 898).

As the court in *Read v. City of Fairview Park,* 146 Ohio App.3d 15, 764 N.E.2d 1079 (2001), recently explained:

> Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance.

*Id.* at 19, 764 N.E.2d 1079 (quoting Prosser, *Law of Torts* § 121, at 856 (4th ed.1971)).

Plaintiff argues that defendant used the criminal trial for the ulterior purpose of holding plaintiff financially accountable for the alleged lost revenues due to the bomb threat. That is, plaintiff claims that once the proper legal proceeding was in place, defendant misused the criminal trial to garner information that it could use in a civil suit. Defendant "continued" the criminal proceeding, plaintiff argues, by withholding "vital information" from the prosecution. Doc. 37 at 43.

Similar to plaintiff's malicious prosecution claim, plaintiff has failed to produce sufficient evidence to support his claim for abuse of process. Beyond plaintiff's conjecture, the record is devoid of any evidence that the criminal proceeding was "perverted to attempt to accomplish an ulterior purpose for which it was not designed."

As the court noted in *Robb v. Chagrin Lagoons Yacht Club, Inc.,* 75 Ohio St.3d 264, 271, 662 N.E.2d 9 (1996), "abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." Plaintiff has produced no credible evidence that defendant was attempting to use the courts for any ulterior purpose. The only evidence in the record is that the prosecutor decided independently to bring *and continue* the criminal case against the plaintiff. *See e.g.* Palmer Aff. ¶ 4 ("I never had any conversation with anyone at FMC in which anyone attempted to influence the prosecution of Bickley."); Prosowski Aff. ¶ 5 ("Aside from the voice identifications of Bickley by its employees during the investigation, FMC had no input into our decision to prosecute Bickley.").

Defendant's motion as to plaintiff's abuse of process claim shall therefore be granted.

## C. Breach of Employment Contract

Under Ohio's employment at-will doctrine, "the employment relationship between employer and employee is terminable at the will of either; thus, an employee is subject to discharge by an employer at any time, even without cause." *Wright v. Honda of Am. Mfg., Inc.,* 73 Ohio St.3d 571, 574, 653 N.E.2d 381 (1995).

In *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), the Supreme Court of Ohio announced two exceptions to an employer's unfettered right to discharge an at-will employee: "(1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee." *Wright,* 73 Ohio St.3d at 574, 653 N.E.2d 381 (citing *Mers,* 19 Ohio St.3d at 104–05, 483 N.E.2d 150).

Plaintiff claims that both exceptions apply. Plaintiff contends that defendant altered the terms of discharge and promised

to rehire him after he was cleared of wrongdoing.

### 1. Implied Contract Exception

 Under the first exception, to ascertain the implicit terms of an employment relationship, courts consider all of the facts and circumstances surrounding the relationship, including "the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question ...." *Mers,* 19 Ohio St.3d at 104, 483 N.E.2d 150. To overcome a summary judgment motion and raise a factual issue as to whether an employment-at-will agreement has been altered by an implied agreement,

> the trier of fact can consider, in addition to the facts and circumstances set forth in *Mers,* such evidence, which includes, but is not limited to, that information contained in employee handbooks, oral representations made by supervisory personnel that employees have been promised job security in exchange for good performance, and written assurances reflecting company policy.

*Wright,* 73 Ohio St.3d at 575, 653 N.E.2d 381.

 Plaintiff argues that terms in the employee handbook, the defendant's policy of progressive discipline prior to termination, and certain written assurances altered plaintiff's at-will employment relationship and created an implied contract that plaintiff would not be terminated without just cause. Other factors demonstrate, however, that defendant did not alter the terms of plaintiff's at-will employment.

First, plaintiff's application provides: "employment is at-will and can be terminated by either party with or without notice, at any time for any reasons or no reason." Bickley Dep. Ex. 1. This precludes plaintiff from claiming that defendant agreed to employ him on any other basis. *See Bernard v. Rockwell Int'l Corp.,* 869 F.2d 928, 932 (6th Cir.1989) (finding that "a jury could not reasonably have concluded that the parties intended a three-year-old handbook of company policies and goals to modify an express provision of a written employment contract signed by the parties, indicating that employment was at-will").

Second, Bickley is precluded from maintaining an implied contract claim based on the employee handbook because the handbook contains an express contractual disclaimer, providing: "Nothing in this folder is to be construed as constituting the terms of an employment contract." Bickley Dep. Ex. 2. The Supreme Court of Ohio stated in *Wing v. Anchor Media, Ltd. of Texas,* 59 Ohio St.3d 108, 111, 570 N.E.2d 1095 (1991), that "[a]bsent fraud in the inducement, a disclaimer in an employee handbook stating that employment is at will precludes an employment contract other than at will based upon the terms of the employee handbook."

Thus, even if defendant progressively disciplined three other employees, as plaintiff argues, this alone cannot create the existence of an implied contract—especially with the express contractual disclaimer and reservation of rights in the employee handbook. Accordingly, plaintiff has not met his burden in demonstrating the existence of an implied employment contract.

### 2. Promissory Estoppel Exception

 The Ohio Supreme Court has stated that, where a plaintiff claims the promissory estoppel exception to the employment at will doctrine, the test "is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." *Mers,* 19 Ohio St.3d at 105, 483 N.E.2d 150.

In *Helmick v. Cincinnati Word Processing, Inc.,* 45 Ohio St.3d 131, 543 N.E.2d 1212 (1989), the court explained the nature of a promise that can give rise to the promissory estoppel exception: "Standing alone, praise with respect to job performance and discussion of future career development will not modify the employment-at-will relationship. A demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine." *Id.* at ¶ 3 Syllabus.

Plaintiff claims that the terms of a letter sent by defendant one day after his arrest promised plaintiff job security and assured him that he would be rehired if he was found innocent of the bomb threat. Doc. 37 at 49. The letter provided:

> Based on the incident which occurred on November 2, 1999, effective immediately you are being suspended without pay pending further investigation and a final determination. You will be advised of the outcome of that investigation at its conclusion.

Bickley Dep. Ex. 7.

Plaintiff contends that this "can be interpreted as a promise of employment until a jury verdict and creates a jury question on promissory estoppel claim." Doc. 37 at 49. No reasonable jury could conclude, however, that plaintiff could reasonably rely on this letter as a promise of rehire if a jury subsequently found him not-guilty. Defendant's motion for summary judgment as to plaintiff's implied breach of contract claim shall therefore be granted.

## D. Public Policy Wrongful Discharge

■ To make out a public policy wrongful discharge claim in Ohio, a plaintiff must prove: 1) a clear public policy exists and is manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the clarity element); 2) dismissing employees under the circumstances involved in the plaintiff's case would jeopardize the public policy (the jeopardy element); 3) the plaintiff's dismissal was motivated by reasons related to the public policy (the causation element); and 4) the defendant lacked a legitimate business justification for dismissing plaintiff (the overriding justification element). *Collins v. Rizkana,* 73 Ohio St.3d 65, 69, 652 N.E.2d 653 (1995).

Plaintiff claims that his termination violated the public policy "embodied in the *Code of Professional Responsibility* (Code) E.C. 1–2,2–1, adopted by the Ohio Supreme Court, as well as in Federal and State common law." Doc. 37 at 53. Plaintiff claims that defendant suspended him on the same day that plaintiff notified defendant that he was retaining counsel. Moreover, the decision to terminate plaintiff came after defendant's counsel called defendant. *Id.* at 54. Consultation with an attorney, plaintiff argues, is so fundamental to the system of justice that "an employer discharge of an employee for consulting an attorney violates Public Policy." *Id.* at 53.

■ Plaintiff cites to *Chapman v. Adia Servs., Inc.,* 116 Ohio App.3d 534, 688 N.E.2d 604 (1997), for the proposition that under Ohio public policy, a person cannot be terminated "solely for consulting an attorney." *Id.* at 537, 688 N.E.2d 604. *Chapman* is distinguishable on several grounds, and it does not state that an Ohio public policy exists entitling employees to have an attorney present at meetings with his or her employer. *Cf., Latimore–Debose v. BVM, Inc.,* 1996 WL 157357, at *4, 1996 Ohio App. LEXIS 1425, at *14 (Apr. 4 1996) (stating that "contrary to appellant's novel and unsupported assertion, the constitutionally protected right to counsel does not attach to employer/employee meetings").

Nonetheless, even if plaintiff were correct, his public policy wrongful discharge

claim still fails. Plaintiff has produced no evidence of the causation or overriding justification elements. No reasonable juror could conclude that defendant terminated plaintiff "solely" because he sought advice from an attorney. Plaintiff fails to demonstrate that defendant took any other information into consideration besides the 911 call.

Defendant's motion for summary judgment as to plaintiffs public policy wrongful discharge claim shall therefore be granted.

## II. Defendant's Counterclaim: Tortious Interference With A Business Relationship

Plaintiff contends that defendant's counterclaim fails as a matter of law because defendant has not met the elements of a claim for tortious interference with a business relationship. According to plaintiff, defendant fails to identify a third party that it allegedly discontinued business with and fails to provide evidence that plaintiff intentionally terminated a business relationship. Additionally, plaintiff alleges that defendant's counterclaim must fail because it is "retaliatory and punitive in nature and an inherent second criminal prosecution." *Id.* at 8.

■■■ In Ohio, "[t]he torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B–Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg & Constr. Trades Council,* 73 Ohio St.3d 1, 14, 651 N.E.2d 1283 (1995). The essential elements to recovery for a tortious interference with a business relationship are: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting

therefrom." *Wolf v. McCullough–Hyde Memorial Hosp.,* 67 Ohio App.3d 349, 355, 586 N.E.2d 1204 (1990).

■■■ Defendant has come forward with enough evidence to create a question of fact regarding each element of its claim. Defendant alleges that:

(1) it employed over three hundred employees [existence of contract]; (2) Bickley was one of those employees [knowledge of contract]; (3) Bickley made the bomb threat knowing it would cause evacuation [procurement of breach]; (4) the bomb threat was false [lack of justification]; and (5) the Company was damaged [damages].

Doc. 28 at 8.

Plaintiff claims that defendant did not have a "business relationship" with its employees. Ohio courts have, however, approved tortious interference claims that are based on interference with both written employment contracts and oral contracts for employment at-will. *See e.g., Smith v. Klein,* 23 Ohio App.3d 146, 148, 492 N.E.2d 852 (1985) (stating that "a cause of action is cognizable for interference with an employment relationship, even absent a contract"); *Nelson v. Akron,* 1990 WL 167357, at *3, 1990 Ohio App. LEXIS 4799, at *8 (Oct. 31, 1990) ("The trial court's initial conclusion that there can be no tortious interference with an employment contract terminable at will is incorrect."). Thus, because of defendant's "business relationship" with its employees—and plaintiff's obvious knowledge of that relationship—defendant has met its burden as to the first two elements.

Plaintiff argues that defendant cannot meet the third element because the alleged interference does not rise to the level of a "serious breach." Doc. 36 at 5. According to plaintiff, this element requires that the interference lead to a "complete annihilation or alteration of the contract."*Id.* at 6.

Accordingly, a "temporary contractual interruption is not enough, especially if it lasts no longer than 14 hours and no contracts are destroyed." Doc. 36 at 5.

Plaintiff presents a novel argument that may best relate to the tort of tortious interference with a contract. I cannot conclude, however, that to be found liable for the tort of tortious interference with a business relationship, a claimant must demonstrate that the relationship was permanently and completely destroyed. Plaintiff has no support for the theory that the interference has to rise to a certain "seriousness" level before it qualifies as a tort. Thus, because defendant presents evidence that creates a question of fact as to whether plaintiff made the 911 call, defendant has met the third element of its claim.

As to the fourth element, plaintiff claims that defendant "has failed to bring forth a single contract that was terminated or a business contract that was lost due to Mr. Bickley's alleged interference." Doc. 36 at 10.

To the contrary, defendant has presented enough evidence to meet its burden at this state of the litigation. In its answers to interrogatories, defendant stated that:

> The Company's damages consist of losses it sustained as a result of its having to cease operations at the facility for the balance of the second shift, all of third shift and a portion of first shift after the bomb threat was made on November 2, 1999. The income it would have earned if it had been able to operate during those shifts would have contributed to its overhead. Due to the cessation of operations, it lost the contribution of that income to the payment of its overhead.

Doc. 28 at 12.

The defendant estimated these damages at $10,000.00. Thus, there is no basis for plaintiff's contention that defendant has not identified damages recoverable in a claim for tortious interference with a business relationship.

Finally, plaintiff claims that defendant's claim fails because it is "quasi-criminal in nature." Doc. 9 at 8. The court in *Uebelacker v. Cincom Sys., Inc.,* 48 Ohio App.3d 268, 274, 549 N.E.2d 1210 (1988) stated: "an acquittal on a criminal charge is not a bar to a subsequent civil action if the objective of the civil action is compensation, not punishment." Defendant's counterclaim requests damages for the losses incurred during the fourteen hour shut down. Plaintiff provides no evidence why this should be considered punitive or retaliatory.

Because defendant has created a question of fact on each element of its claim, plaintiff's motion for summary judgment as to defendant's counterclaim shall be denied.

## CONCLUSION

It is, therefore,

Ordered that

1. Defendant's motion for summary judgment be, and hereby is, granted as to plaintiff's state law claims.

2. Plaintiff's motion for summary judgment be, and hereby is, denied as to defendant's counterclaim.

So ordered.