DECISION AND JOURNAL ENTRY
Plaintiff-Appellant, Carol Alloway (Alloway), has appealed from a judgment of the Lorain County Common Pleas Court that granted summary judgment to Defendant-Appellees, WLW, Inc., dba Care Services (Care Services) and W.W. Extended Care, Inc. dba Ohio Extended Care Center (OECC). This Court affirms.
 I.
OECC is a long-term healthcare facility that seeks support for its management from its parent corporation, Care Services. Alloway first began working with OECC as a licensed practical nurse (LPN) on approximately January 28, 1991. At the time Alloway applied for the LPN position, she signed an employment application that stated the terms of her employment were at-will. The assistant director of nursing (ADON) told Alloway that if she did a good job, she would have a job forever. Alloway also signed a receipt for the employee handbook, which also contained statements of the employment-at-will relationship.
During June 1, 1991, Alloway voluntarily resigned from her position at OECC. Alloway reapplied for the LPN position on August 22, 1991. Again, she filled out and received the same paperwork regarding her at-will employment. At no time did Alloway request that the language be stricken or altered. There were no discussions regarding circumstances under which Alloway could be discharged. In 1993, Alloway was promoted to the position of infection control coordinator.During her employment at OECC, the employee handbook was modified frequently. Alloway signed a receipt acknowledging that she had received the modified handbook on December 29, 1994. This handbook contained the same at-will language in the introduction and the disciplinary section.
In 1995, Alloway was promoted to ADON. Alloway received a job description of the ADON position that contained another statement of the at-will employment. The employment handbook was modified again in 1996. Alloway signed a receipt acknowledging that she had received the modified handbook, which contained the same at-will language in the introduction and disciplinary section.
In January of 1996, Ms. Wulff (Wulff), the executive director of Care Services came to OECC to instruct charge nurses and supervisors on how to effectively counsel nursing assistants. While she was instructing the staff, they voiced concerns about the upper management of OECC. Wulff subsequently met with OECC's administrator, Ms. Caldeira (Caldeira), to discuss these concerns. The two agreed that an independent human resources consultant, Mr. Navarre, should conduct management training sessions.
In March, Caldeira and Wulff conducted an anonymous employee survey. Except for the management staff, OECC employees were encouraged to fill out the survey and could add their comments by supplementing the survey with a letter. Out of approximately 200 employees, approximately 185 filled out the survey and 35 employees wrote additional letters. The survey results and letters indicated that the employees were still upset with the upper management. Alloway was described as "rude, hateful, nasty and will lie about you to your face." Both Caldeira and Alloway told the management at Care Services that they believed the negative comments were from a few disgruntled employees.
Rather than making a drastic change in the management structure of OECC, Care Services attempted to improve the existing team. Wulff called and sent Alloway a card of encouragement as an initial step. Prior to receiving the card and phone call, Alloway had received an inquiry for a job from a friend at Good Samaritan Nursing Home; however, Alloway immediately declined the invitation.
Meanwhile the independent consultant, Mr. Navarre, met with Wulff, Caldeira, and Ms. Gray, the Executive Director of Care Services to discuss the management situation at OECC. Mr. Navarre perceived OECC's problem as one of personality and lack of management skills. He recommended follow-up training sessions with all levels of management and that Caldeira, OECC's Director, and Alloway be discharged.
During that time, OECC's medical director also came to Caldeira to voice his concerns about Alloway's job performance, which had been reported to him by the nursing staff. Based on his report, Calderia conducted a meeting with the nursing staff to discuss the situation. Several nurses expressed their concern of Alloway's management tactics and stated that they were afraid to tell Calderia about Alloway because they thought Alloway would fire them.
During April, OECC became aware that a local organization was beginning to collect union authorization cards. In an effort to combat the union campaign, Care Services sent its Director of Professional Services, Ms. Deegan, to OECC to talk to the employees. Although Ms. Deegan was sent to stop the campaign, she immediately heard comments from the nursing staff about OECC's management. Ms. Deegan reported these comments to her supervisor Ms. Gray. Ms. Gray subsequently spoke with Ms. Caldeira, who in turn demoted Alloway to her former position as infection control coordinator. In this position, Alloway would have no direct supervisory responsibilities.
Shortly thereafter, Ms. Deegan assumed the role as acting Director of OECC when the Director was discharged and the union activity ceased. Ms. Deegan repeatedly counseled Alloway about the perceptions of the staff and Alloway's need to address this problem. She stated in her deposition that Alloway was hard to work with and unwilling to respect the contributions of others.
During May of 1996, the skilled nursing supervisor came to Ms. Deegan with the complaint that Alloway was not communicating with her. Ms. Deegan met with the supervisor and Alloway to discuss the problem. At the meeting, Alloway was reluctant to talk about the issue and denied the problem. At this point, Ms. Deegan determined that Alloway could no longer effectively work at OECC. After meeting with Caldeira, Ms. Deegan and Claderia decided that Alloway should be terminated. Alloway was discharged by OECC on May 21, 1996.
On January 13, 1997, Alloway filed a complaint against OECC alleging breach of implied contract, promissory estoppel and defamation as a result of the termination of her employment with OECC. On April 1, 1998, OECC moved for summary judgment, which the trial court granted. Alloway timely appealed, asserting two assignments of error.[1]
 II. ASSIGNMENT OF ERROR NUMBER ONE The trial court erred in granting summary judgment with respect to [Alloway's] claim of promissory estoppel when genuine issues of material fact existed on each element of [her] claim.
 ASSIGNMENT OF ERROR NUMBER TWO The trial court erred in granting summary judgment with respect to [Alloway's] claim of breach of implied contract when genuine issues of material fact were present as to each element of [her] claim.
 In reviewing a trial court's ruling on a motion for summary judgment, this Court applies the same standard a trial court is required to apply in the first instance: whether there were any genuine issues of material fact and whether the moving party was entitled to judgment as a matter of law. Parenti v. Goodyear Tire Rubber Co. (1990), 66 Ohio App.3d 826, 829. In Dresher v. Burt (1996), 75 Ohio St.3d 280, 293, the Ohio Supreme Court outlined the respective burdens upon the moving and nonmoving parties in the context of a motion for summary judgment pursuant to Civ.R. 56:
 [W]e hold that a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
(Emphasis sic.) These principles were reaffirmed in Vahilav. Hall (1997), 77 Ohio St.3d 421, 429.
Thus, unless the movant fulfills both prongs of the Dresher
duty, the motion for summary judgment must be denied. The moving party is required to state the basis for his motion and then point to "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any," that support the motion. Civ.R. 56(C). Merely alleging that a nonmoving party lacks evidence does not satisfy that obligation. Unless and until that burden is met, the nonmovant is under no corresponding duty, and the motion must be denied. "[A] movant's conclusory assertions of no evidence against the nonmovant [are] no longer good enough in Ohio." Am.Express Travel Related Serv. Co., Inc. v. Mandilakis (1996),111 Ohio App.3d 160, 164.
However, once the movant satisfies his burden, the nonmovant must then present or point out evidence that satisfies his reciprocal burden to demonstrate the existence of a material factual dispute. Pursuant to Civ.R. 56(E), a nonmovant "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." If the nonmovant fails to satisfy his reciprocal burden, summary judgment, if appropriate, should be granted. Civ.R. 56(E). This Court will analyze both parties' arguments and the evidence presented in support of those arguments to establish whether the respective burdens have been met.
 A.
Ohio courts have recognized a strong presumption in favor of employment-at-will in the absence of an expression of the parties' intent to be bound. Henkel v. Educational Research Council
(1976), 45 Ohio St.2d 249, 255, quoting Forrer v. Sears, Roebuck Co. (1967), 36 Wis.2d 388, 393, 153 N.W.2d 587. "Either party to an at-will employment agreement may terminate the relationship at any time." Harold v. Bridgestone/Firestone, Inc. (Sept. 16, 1998), Summit App. No. 18915, unreported, at 15. "Underlying this presumption is the policy that parties to an employment contract should be free to design their relationship in the way they choose." Id. An employer can alter the at-will relationship through the doctrine of promissory estoppel, or by creating an expressed or implied contract. Peters v. MansfieldScrew Machine Products Co. (1991), 73 Ohio App.3d 197, 200. Because Alloway has raised both of these exceptions on appeal, this Court will address them separately.
 B. Promissory Estoppel Claim
In order to avoid injustice, the doctrine of promissory estoppel will be applied in an employment-at-will agreement. SeeGargasz v. Nordson Corp. (1991), 68 Ohio App.3d 149, 153. The test in these cases is whether (1) there were representations made by the employer, (2) which the employer should have reasonably expected to induce reliance in the employee, and (3) the employee actually relied on the representations (4) to his or her detriment. See id. This Court has held that "[a]bsent the application of equitable doctrines such as detrimental reliance, the terms and conditions of an at-will contract can be prospectively changed without consideration." Nichols v.Waterfield Financial Corp. (1989), 62 Ohio App.3d 717, 719.
"The norm in employer-employee relations is that employees may be terminated for poor job performance. When claiming that this norm is not applicable, an employee must point to specific representations by the employer indicating that termination would not be based upon performance." Penwell v. Amherst Hosp. (1992),84 Ohio App.3d 16, 20. In Bruno v. Struktol Co. of Am. (1991),62 Ohio App.3d 509, 514, this Court held that an employee must point to specific promises and cannot rely on "nebulous representations." The employee must demonstrate that, in the absence of such promises, he or she was justified in detrimentally relying on the employer's representations. Id. at 513. "Standing alone, praise with respect to job performance and discussion of future career development will not modify the employment-at-will relationship." (Citations omitted.) Helmick v. Cincinnati WordProcessing, Inc. (1989), 45 Ohio St.3d 131, paragraph three of the syllabus.
In support of its motion for summary judgment, OECC pointed to its employee handbook, which stated in its introduction that,
 None of the benefits or policies in this Handbook are intended by reason of their publication to confer any rights or privileges upon you, or entitle you to be or remain employed by the employer, or should be considered as altering the employment-at-will relationship between you and Ohio Extended Care Center.
 OECC further pointed to its disciplinary procedure section of the employee handbook, which stated, The Center may decide, at its discretion, to skip any specific warning and institute immediate termination depending on the severity. Nothing in this section is intended to change or alter the employment-at-will relationship existing between the employees and the Center.
 OECC argued that the above statements in its handbook proved that an employment-at-will relationship existed. Additionally, OECC relied on Penwell to support its argument that it made no specific promises that Alloway could reasonably rely upon, and that such representations at the time an employee was hired are nebulous and insufficient to support any promise of job security to alter the employment-at-will relationship.
On the other hand, Alloway argued that OECC repeatedly made promises of job security. First, Alloway was told at her entrance interview that if she did a good job, she could stay employed there as long as she liked.[2] After the negative employee survey, Alloway was told by Wulff not to put too much emphasis on it and that she should not just throw it all away by leaving the facility. Alloway also pointed to a letter that she received from Wulff urging her not to take the job at Good Samaritan Nursing Home. Lastly, Alloway argued that the employee handbook sets out a pattern for disciplinary actions, which she should have received prior to her termination.
In reviewing the entire record, this Court finds that Alloway was never promised job security. The above statements were mere words of encouragement and cannot reasonably be relied upon to expand the normal expectation of an at-will employment relationship. The record is devoid of any specific amount of time that Alloway would be employed. As to the employee handbook, this Court concludes that the plain language of the disciplinary policy shows that it was not mandatory. Because the policy contained the word "may" instead of "must," it could not reasonably have altered the employment-at-will relationship.
Even if specific promises were made by OECC, this Court fails to find any detrimental reliance by Alloway. In her own deposition, Alloway stated that "I laughed at her [friend's job offer at Good Samaritan Nursing Home] and I said well, I will remember that and keep that in mind." Alloway's deposition also indicates that she did not receive a letter from Ms. Wulff until after she had already rejected her friend's suggestion. Alloway also admitted that she did not contact her friend and pursue a job at Good Samaritan Nursing Home until six months after she was terminated by OECC. This Court finds that Alloway made a conscious, well-informed, uncoerced decision to, as she described in her deposition, remain "dedicated to a useless cause." As such, turning down another employment inquiry does not present a jury question of detrimental reliance. Wing v. Anchor Media,Ltd. of Texas (1991), 59 Ohio St.3d 108, 111. Accordingly, the trial court properly granted summary judgment to OECC on Alloway's promissory estoppel claim. Alloway's first assignment of error is overruled.
 C. Implied Contract Claim
Although an employment agreement may appear to be at-will, the trier of fact should examine the history of the employer-employee relationship and the facts and circumstances surrounding the employment to determine the explicit and implicit terms in their agreement regarding discharge. Wright v. Honda ofAm. Mfg., Inc. (1995), 73 Ohio St.3d 571, 574. The facts and circumstances which may be considered include the character of the employment, the course of dealing between the parties, written assurances reflecting company policy, information contained in employment handbooks, and oral representations made by supervisory personnel regarding job security and good performance. (Citations omitted). Id. at 574-75. An implied contract exists if, from these facts and circumstances, it appears that there was in fact an offer, acceptance, and consideration. Tersigni v. Gen. Tire,Inc. (1993), 91 Ohio App.3d 757, 760. This Court has previously observed that "seldom will an employee, failing to establish promissory estoppel to alter an employment-at-will agreement, be able to establish an implied employment contract based on the same set of facts." Gargasz, 68 Ohio App.3d at 155. Furthermore, the party seeking to establish an implied contract has the heavy burden of proving the existence of each element necessary to the formation of a contract. Id. at 154.
In support of summary judgment, OECC again pointed to the policies set forth in its employee handbook and argued that there is no evidence that alters the employment-at-will relationship. It further pointed out that Alloway's job description also contained another statement that her employment was at-will. To rebut OECC's argument, Alloway relied on the same evidence she used to support her claim for promissory estoppel.
In construing all the facts presented, and all such facts being construed most strongly in favor of the non-moving party, this Court believes that reasonable minds could not differ concerning whether an implied contract existed between OECC and Alloway. There is no genuine issue of material fact because the facts do not demonstrate mutual assent by the parties limiting or restricting the at-will nature of the employment relationship. Therefore, OECC was entitled to summary judgment as a matter of law. Alloway's second assignment of error is overruled.
 III.
Alloway's assignments of error are overruled. The judgment of the trial court granting summary judgment in favor of OECC is affirmed.
 __________________ BETH WHITMORE
SLABY, P.J., BATCHELDER, J., CONCUR.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
[1] This Court notes that Alloway has abandoned all claims on appeal except for her claim for breach of implied contract and promissory estoppel.
[2] This Court notes that Alloway subsequently resigned from her position and that there was no allegation of any such promise of permanent employment when she was rehired for her second tenure of employment.