[Cite as *West v. Fcility Governing Bd. of Stark Cty. Community Corrections*, 2011-Ohio-2951.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                          |   |                          |
|--------------------------|---|--------------------------|
|                          | : | JUDGES:                  |
| AARON WEST               | : | Sheila G. Farmer, P.J.   |
|                          | : | John W. Wise, J.         |
| Plaintiff-Appellant      | : | Julie A. Edwards, J.     |
|                          | : |                          |
| -vs-                     | : | Case No. 2010CA00212     |
|                          | : |                          |
|                          | : |                          |
| FACILITY GOVERNING BOARD OF | : | O P I N I O N         |
| STARK REGIONAL COMMUNITY |   |                          |
| CORRECTIONS              |   |                          |
|                          |   |                          |
| Defendant-Appellee       |   |                          |

CHARACTER OF PROCEEDING:        Civil Appeal from Stark County
                                Court of Common Pleas Case No.
                                2009 CV 02571

JUDGMENT:                       Affirmed

DATE OF JUDGMENT ENTRY:         June 13, 2011

APPEARANCES:

For Plaintiff-Appellant                 For Defendant-Appellee

GREGORY A. BECK                         NEIL D. SCHOR
Baker, Dublikar, Beck,                  Harrington, Hoppe & Mitchell, Ltd.
Wiley & Matthews                        26 Market Street, Suite 1200
400 South Main Street                   P.O. Box 6077
North Canton, Ohio  44720               Youngstown, Ohio  44501-6077

*Edwards, J.*

{¶1}　Plaintiff-appellant, Aaron West, appeals from the July 6, 2010, Judgment Entry of the Stark County Court of Common Pleas granting summary judgment in favor of defendant-appellee Facility Governing Board of Stark Regional Community Corrections.

STATEMENT OF THE FACTS AND CASE

{¶2}　The Stark Regional Community Corrections Center (SRCCC) is a community-based corrections facility for adults. The facility is governed by an eleven member board, appellee Facility Governing Board of Stark Regional Community Corrections.

{¶3}　Appellant Aaron West was employed by Stark Regional Community Corrections Center as a Resident Supervisor I.　His job responsibilities involved monitoring clients, frisking them and patting them down and supervising them as they moved throughout the facility.

{¶4}　SRCCC has a policy, Policy PERS25,[1] which deals with employee discipline. PERS25 states in relevant part, as follows:

{¶5}　"B. Each disciplinary incident is unique.　The SRCCC, therefore, retains the right to deal individually with the merits of each matter, without creating any precedents for the treatment of any other incident which may arise in the future. Examples given in any rule do not limit the generality of that rule.　These rules and regulations are not to be construed as a limitation upon the rights of the SRCCC, but are merely a guide to aid the employee in knowing what types of behavior are not permitted.

---

[1] The policy had an effective date of June 18, 1992, and was revised on November 8, 2006.

**{¶6}** "C. SRCCC reserves the right to implement discipline on a case by case basis and to administer discipline based on the totality of the circumstances. Disciplinary action may be taken toward an employee by their direct or indirect supervisor or by the Director for unsatisfactory performance or misconduct. The grounds for disciplinary action shall include but not be limited to the following: incompetency, inefficiency, dishonesty, insubordination, failure to adhere to the staff code of ethics, neglect or abuse of clients, neglect of duty, absence without leave, inability or unwillingness to accept supervision, failure to achieve standards established for job duties, criminal convictions and certain traffic violations, knowingly providing false information regarding hours worked or services provided, violence against clients/staff/community.

**{¶7}** "D. When appropriate, disciplinary action is a four-tier progressive process: instruction and cautioning, written reprimand, suspension, and termination…."

**{¶8}** PERS25 further states in paragraph E that "[n]one of the above or below invalidate the employment-at-will relationship nor create a contract of employment with SRCCC."

**{¶9}** Among the reasons listed in paragraph F of PERS25 for disciplinary action, up to and including termination of employment, are violating SRCCC's code of ethics and violation of any socialization/fraternization policy and procedures.

**{¶10}** SRCCC has a specific socialization/fraternization policy (PERS59). PERS59[2] states, in relevant part, as follows:

**{¶11}** "Experience has demonstrated that social relationships between staff members and clients/former clients outside the work environment may lead to

---

[2] The policy has an effective date of June 18, 1992, and was revised effective April 20, 2004.

compromising situations for the client, the employee and the agency.  Therefore, it shall be the policy of the SRCCC to consider non-working relationships as inappropriate and subject to disciplinary action up to and including dismissal.

{¶12}  "The following types of behavior with a current client, including those in residency as well as in referral status, or former client for one year after he/she leaves SRCCC are specifically prohibited.

{¶13} "Engaging in any material transactions with clients, including purchasing, selling, borrowing or lending.  Under no circumstances shall money be exchanged between staff and clients nor shall staff hold any property of clients for safekeeping except in accordance with established storage procedures.  Employees shall not ask or permit clients to perform any duty, compensated or not, of personal nature (i.e., washing employee's personal vehicle).

{¶14} "The exchange of personal letters, pictures, phone calls or information with any current referral, current client, former client for one year after he/she leaves SRCCC, or friends or family of any client without express authorization of the Director.

{¶15} "Engaging in any other personal or business relationship with any current referral, current or former client or friends or family of any current or former client without express authorization of the Director.

{¶16} "Visiting with any former client without express authorization of the Director.

{¶17} "Residing with any former client without express authorization of the Director.

{¶18} "Engaging in any sexual conduct with any current referral, current or former client.

{¶19} "Aiding or abetting any unauthorized relationships with any current referral, current or former client."

{¶20} When asked during her deposition who makes the determination as to the severity of an offense, Fransaia Lodico Dietrich, the Director of SRCCC, testified that the determination is made by the staff member with the information about the offense and an administrative supervisor. If those two deem that the offense warrants a suspension or possible termination, the offense is reported to Dietrich who then assigns an administrative staff member to investigate. According to Dietrich, if the investigation finds that the allegations warrant either a suspension or termination, then a neutral administrator is assigned to carry on the process. The initial staff member who investigated the matter is the one who informs the staff member being investigated of the investigation, the results of the same and the recommendation made for discipline. If the employee desires a hearing, a hearing is held before the neutral administrator, the administrator who brought forth the charges (who is usually the person who conducted the investigation), the staff member the charges are levied against and any witnesses. Prior to the hearing, a recommendation has been made by the investigator as to what the punishment should be.

{¶21} Appellant does not dispute that he became romantically and sexually involved with a woman who had previously been in the SRCCC facility. Dietrich testified that she became aware of the allegations against appellant when a staff member at SRCCC received a phone call on April 7, 2009 indicating that the caller had information

that appellant had a sexual relationship with an ex-resident who was pregnant.   Dietrich then asked the Deputy Director, Craig Prysock, to investigate. According to Dietrich, Prysock made contact with the former client's probation officer who confirmed that the former client was pregnant and had stated that appellant was the father. Appellant's relationship with the former client allegedly began within a week or two after her discharge from SRCCC.   Dietrich then asked appellant to see her and Prysock in Dietrich's office. The meeting occurred on April 8, 2009. Appellant admitted to having had a sexual relationship with the former client, but denied being the father of her child.

**{¶22}** On April 9, 2009, appellant was placed on administrative leave. Prysock, in a memo to Dietrich dated April 10, 2009, recommended that appellant's employment with SRCCC be terminated. Appellant was then personally served on April 14, 2009, by Sheila Gard, Administrative Manager at SRCCC, with a notice of a pre-disciplinary conference scheduled for April 17, 2009. The notice outlined the violation.   Gard testified that prior to the April 17, 2009, hearing, appellant never asked her for copies of individual personnel files for the employees at SRCCC. She further testified that prior to the hearing, she was aware that appellant had requested copies of individual's personnel files.

**{¶23}** Gard, Prysock and appellant were present at the April 17, 2009, hearing, which was not recorded. At the hearing, appellant admitted that he had a sexual relationship with a former client.  Thirteen witnesses testified on appellant's behalf.  As memorialized in a memo to Dietrich dated April 24, 2009, Sheila Gard recommended that appellant be terminated from employment with SRCCC. Appellant was then

terminated. Appellant appealed to the SRCCC board, but his appeal was denied and his termination was upheld.

{¶24} On July 1, 2009, appellant filed a complaint against appellee in the Stark County Court of Common Pleas. Subsequently, on April 15, 2010, appellee filed a Motion for Summary Judgment. Pursuant to a Judgment Entry filed on July 6, 2010, the trial court granted such motion.

{¶25} Appellant now raises the following assignment of error on appeal:

{¶26} "THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS THERE REMAINED GENUINE ISSUES OF MATERIAL FACT."

I

{¶27} Appellant, in his sole assignment of error, argues that the trial court erred in granting appellee's Motion for Summary Judgment. We disagree.

{¶28} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 506 N.E.2d 212. As such, we must refer to Civ.R. 56 which provides, in pertinent part: "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds

can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

{¶29} Pursuant to the above rule, a trial court may not enter summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment, bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Vahila v. Hall,* 77 Ohio St.3d 421, 429, 1997-Ohio-259, 674 N.E.2d 1164, citing *Dresher v. Burt,* 75 Ohio St.3d 280, 1996-Ohio-207, 662 N.E.2d 264.

{¶30} Appellant, in his brief, initially argues that the trial court erred when, in its July 6, 2010, Judgment Entry, it held that appellant was an unclassified employee who was subject to discharge without hearing.

{¶31} Employees in unclassified service hold their positions at the pleasure of the appointing authority, may be dismissed from their employment without cause, and are afforded none of the procedural safeguards available to those in classified service. *Suso v. Ohio Dept. of Dev.* (1993), 93 Ohio App.3d 493, 499, 639 N.E.2d 117, 120-121, *Huber v. Celebrezze* (1984), 14 Ohio App.3d 299, 301, 471 N.E.2d 181, 183-184. Thus, an unclassified employee, lacking a property right, may be discharged without a

hearing. *Shearer v. Cuyahoga Cty. Hosp., Sunny Acres* (1986), 34 Ohio App.3d 59, 60, 516 N.E.2d 1287, 1288.

{¶32}  Appellant does not dispute that he was initially an unclassified employee,[3] but argues that, by providing him with administrative remedies that are normally provided only to classified employees, appellee created a contract with respect to discipline and that appellant, therefore, was entitled to due process before being terminated.  In essence, as noted by appellee, appellant contends that SRCCC created an employment contact with him with respect to discipline and, by doing so, effectively changed his employment status from unclassified to classified. Appellant notes that Fransaia Lodico Dietrich testified, during her deposition, that all employees who were potentially subject to suspension or termination, unless they waived their right to a hearing, were afforded due process and had a right to go through the hearing process.

{¶33}  Appellant has not cited to, nor is this Court aware of, any law providing that, by affording appellant a hearing before terminating him, appellee converted appellant from an admittedly unclassified employee into a classified employee. We find that appellee was entitled to terminate appellant, an unclassified employee, without any hearing, even though it provided appellant with one.

{¶34}  Moreover, appellant contends that SRCCC's employment documents namely its written policies, created an employment contract.  Appellant points out that language in appellee's written policies provide employees with notice and a hearing prior to termination or suspension.

---

[3] Ohio Administrative Code Section 5120:1-14-03(L) provides that persons hired to staff community based corrections facilities are designated unclassified employees.

{¶35} As a general rule in Ohio, employee handbooks do not constitute an employment contract. *Stembridge v. Summit Acad. Mgmt.,* Summit App. No. 23083, 2006-Ohio-4076, citing *Rudy v. Loral Defense Sys.* (1993), 85 Ohio App.3d 148, 152, 619 N.E.2d 449. The handbook is simply a unilateral statement of rules and policies creating no obligations or rights. *Tohline v. Cent. Trus. Co.* (1988), 48 Ohio App.3d 280, 549 N.E.2d 1223.

{¶36} The Ninth District Court of Appeals addressed the issue raised herein in *Stembridge v. Summit Acad. Mgt.,* supra,

{¶37} "An employment relationship is terminable at the will of either party unless expressly stated otherwise. (Citation omitted). *Henkel v. Educational Research Council of Am.* (1976), 45 Ohio St.2d 249, 255, 344 N.E.2d 118. However, the employment at-will doctrine is the subject of two exceptions: (1) the existence of an implied or express contract which alters the terms of discharge; and (2) the existence of promissory estoppel where representations or promises were made to an employee. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 104, 483 N.E.2d 150. Appellant has argued that his employee handbook constitutes an exception to the employment-at-will doctrine.

{¶38} "Generally, employee handbooks do not constitute an employment contract. *Rudy v. Loral Defense Sys.* (1993), 85 Ohio App.3d 148, 152, 619 N.E.2d 449. This Court has previously held that "'employee manuals and handbooks are usually insufficient, by themselves, to create a contractual obligation upon an employer.'" *Gargasz v. Nordson Corp.* (1991), 68 Ohio App.3d 149, 155, 587 N.E.2d 475, quoting *Manofsky v. Goodyear Tire & Rubber Co.* (1990), 69 Ohio App.3d 663, 591 N.E.2d 752.

Evidence of an employee handbook may be considered when deciding whether an implied contract exists, but its existence alone is not dispositive of the question. *Wright v. Honda of Am. Mfg., Inc.* (1995), 73 Ohio St.3d 571, 574-575, 653 N.E.2d 381.

{¶39} "In *Karnes v. Doctors Hospital* (1990), 51 Ohio St.3d 139, 141, 555 N.E.2d 280, the Ohio Supreme Court held that an employee handbook that expressly disclaimed any employment contract could not be characterized as an employment contract. This Court has also addressed disclaimers and found that "'[a]bsent fraud in the inducement, a disclaimer in an employee handbook stating that employment is at will precludes an employment contract other than at will based upon the terms of the employee handbook.'" *Westenbarger v. St. Thomas Med. Ctr.* (June 29, 1994), 9th Dist. No. 16119, at 7, quoting *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph one of the syllabus." Id. at paragraphs 26-28.

{¶40} We find that appellant's employment with appellee was at-will. The employment manual provided by SRCCC to its employees clearly stated that it was not "a contract of employment nor is employment with SRCCC considered to be a contract to be employed for any specific period of time and [SRCCC] retains the right to terminate an employee for any reason at any time." Moreover, with respect to employee discipline, PERS25 expressly states that it reserved the right to implement discipline on a case-by-case basis and that every disciplinary incident was unique. PERS25 also explicitly states that it was not intended to invalidate the employment at-will relationship or create a contract of employment. Appellant clearly was an at-will employee who admitted to violating appellee's socialization/fraternization policy. He was therefore, subject to termination at the discretion of Dietrich.

**{¶41}** Appellant further contends that the trial court erred in finding that appellee's socialization/fraternization policy was a "rational policy within the realm of accepted community corrections practices and customs." Appellant maintains that SRCCC's policy, which prevents an employee from fraternizing with a former client who is no longer in the correctional facility for a period of one year after the client leaves the facility, violates the constitutional right to privacy.

**{¶42}** The privacy right stems from specific constitutional guarantees. *Paul v. Davis* (1976), 424 U.S. 693, 712-713, 96 S.Ct. 1155, 47 L.Ed.2d 405. "[T]he personal rights found in this guarantee of personal privacy must be limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty….'" Id.

**{¶43}** The United States Supreme Court has recognized that the federal constitutional privacy right protects two narrowly drawn types of interests. One interest concerns independence in making certain kinds of important decisions. *Whalen v. Roe* (1977), 429 U.S. 589, 599-600, 97 S.Ct. 869, 51 L.Ed.2d 64. Such decisions concern "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Paul* at 713.

**{¶44}** While appellant maintains that at issue in the case sub judice is the fundamental right to procreation, contraception and child rearing, we disagree. There is no fundamental right to all private consensual adult activity. See *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512. In *Lowe,* the Ohio Supreme Court held that a stepfather did not have a fundamental right to engage in private, consensual, adult sexual conduct with his stepdaughter. In the case sub judice, we find that a corrections worker such as appellant does not have a fundamental right to engage in a

private, consensual sexual relationship with a former client. We further note that appellee's policy, which limits only certain personal and business relationships between appellee's employees, clients, and former clients, does not prohibit appellant from ever having such a relationship with a former client. Rather, such policy only prohibits such relationship for one year after the client leaves the facility. After the one year period is up, appellant is free to engage in a consensual, sexual relationship with the former client. There is no dispute that appellant was aware of such policy prior to entering into his relationship with the former client and, therefore, was subject to termination or other punishment at the discretion of Dietrich.

{¶45} Because no fundamental right is involved, a rational basis test is used to determine whether appellee's policy is constitutional. The policy need only need only have a reasonable relationship to some legitimate governmental interest. *Lowe,* supra. at paragraph 24. "While it is not enough under the rational-basis test for the government to just announce a noble purpose behind a statute, the statute will pass if it is reasonably related to any legitimate state purpose." Id at paragraph 25.

{¶46} During her deposition, the following testimony was adduced when Dietrich was questioned about the policy:

{¶47} "Q. Okay. The first paragraph it says 1, Policy, it starts with 'Experience has demonstrated that social relationships between staff members and clients/former clients outside the work environment may lead to compromising situations for the client, the employee and the agency.' Do you see that first sentence?

{¶48} "A. I do.

{¶49} "Q. Okay. Was there some kind of study or particular circumstance that arose that was being referenced to in the creation of this particular policy that led your agency to believe that such a policy was necessary?

{¶50} "A. Well, as it says, it's (sic) experience. Those of us that were involved in drafting the initial had prior experience, many of us in corrections, and it is a - - and it's an accepted - - what's the word? I can't' think of the word I want to use - - concern - - I can't think of what word I want to use - - in corrections.

{¶51} "Q. Okay. And you said in drafting it, for example, you had personal experiences in prior work history, I am assuming, with regards to this type of policy.

{¶52} "A. I had personal experience in corrections, yes.

{¶53} "Q. Okay. Well, I guess that was a bad question. You know, to say there is a problem with, you know, compromising situations with regards to personal relationships in corrections.

{¶54} "A. Yes.

{¶55} "Q. What were the personal experiences that you had where those types of personal relationships within corrections were problematic which led you to believe that this type of policy was necessary at SRCCC?

{¶56} "A. I said that those of us that had - - were involved in developing this - -

{¶57} "Q. Right.

{¶58} "A. - - had prior experience in corrections, and this was an accepted regulation in corrections.

{¶59} "Q. Okay.

{¶60} "A. Because of the authoritative position that workers in corrections have

{¶61} "Q. Okay. I misunderstood your statement. So what you were saying is because the group of you that was in the process of creating this policy had prior work experience in the corrections field, you were aware of other groups and agencies having similar policies and thought that it was an appropriate one for this particular agency - -

{¶62} "A. Yes.

{¶63} "Q. - - is that a fair statement?

{¶64} "Q. Yes." Deposition of Fransaia Lodico Dietrich at 30-32.

{¶65} Moreover, in her affidavit, which was attached to appellee's Motion for Summary Judgment, Dietrich stated, in relevant part, as follows:

{¶66} "14. In my experience as SRCCC Director since 1995, and based upon my work, experience and training in the corrections field, it has been demonstrated that social relationships between staff members and clients/former clients outside the work environment may lead to compromising situations for SRCCC clients, the employee, and SRCCC itself. Particularly, the integrity and reputation of SRCCC is impacted when clients/former clients become involved with staff in social relationship situations.

{¶67} "15. Research on anti-fraternization policies in community corrections facilities has been developed which takes into consideration specific policies aimed at prohibiting certain staff/ex-offender relationships, including personal, social and sexual relationships, because of the interest in insuring the impartiality of correctional employees and their treatment of probationers and parolees, including individuals who become clients and former clients of SRCCC. This is true even for a time after discharge, such as one year, because often there is a continued interaction with the former client and the judicial system and authorities.

{¶68} "16. Correctional employees who form personal relationships, including romantic, sexual or business relationships, with probationers, parolees and ex-offenders, can develop relationships which become inappropriate insofar as the level of influence which a staff member and/or client or former client can each exercise over the other based upon the nature of the romantic, sexual, or business relationship."

{¶69} In addition, when asked how the one year time frame contained within the policy came about, Craig Prysock testified that he believed that it came about because more than 50% of appellee's clients, after leaving SRCCC's facility, were put on intensive supervision or intensive probation for approximately one year. Deposition of Craig Prysock at 41-42. Thus, during such period, there would be continued contact between the corrections officer, who is a figure of authority, and the former client.

{¶70} Based on the foregoing, we find that the trial court did not err in finding that the socialization/fraternization policy was a rational policy.

{¶71} Appellant also asserts that the trial court erred in determining that there was no violation of public policy.

{¶72} Pursuant to *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, a discharged employee has a private cause of action sounding in tort for wrongful discharge when his or her discharge is in contravention of a "sufficiently clear public policy." *Id.* at 233. In *Greeley,* the Ohio Supreme Court recognized that the public policy was "sufficiently clear" when the General Assembly had adopted a specific statute forbidding an employer from discharging or disciplining an employee on the basis of a particular circumstance or occurrence. *Greeley* noted other exceptions might be recognized when the public policy could be deemed to be "of

equally serious import as the violation of a statute." *Id.* at 235. "The existence of such a public policy may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law." *Painter v. Graley*, 70 Ohio St.3d 377, 384, 1994-Ohio-334, 639 N.E.2d 51.

{¶73} In order to establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must demonstrate:

{¶74} "1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

{¶75} "2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

{¶76} "3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

{¶77} "4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)." *Id.* at 384 at fn. 8. See also *Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526 at paragraphs 7-10.

{¶78} The clarity and the jeopardy elements are questions of law and policy to be determined by the court. *Collins v. Rizkana*, 73 Ohio St.3d 65, 70, 1995-Ohio-135, 652 N.E.2d 653. The causation and overriding-justification elements are questions of fact to be determined by the trier of fact. *Id.*

**{¶79}** In the case sub judice, appellant specifically alleged that he was terminated in violation of public policy for requesting a hearing and attempting to defend himself by requesting public documents from appellee to use in his defense. Appellant maintains that such documents show that another employee who had sexual contact with a former client within the one year time frame contained in PERS59 was not terminated, but rather received a 30 day suspension.  Appellant asserts that he was retaliated against for requesting such information.

**{¶80}**  However, as noted by appellee, appellant's retaliation claim is premised on his request for a hearing and for public documents.  Appellant, with respect to public documents, contends that he was retaliated against for requesting SRCCC employee files to use in his defense.  As is stated above, Prysock, in a memo to Dietrich dated April 10, 2009, recommended that appellant's employment with SRCCC be terminated. Appellant did not request a hearing until after such date. Moreover, as to appellant's request for public documents, appellant did not request the same until after he received notice on April 14, 2009, of the disciplinary hearing scheduled for April 17, 2009. Appellee, therefore, could not have retaliated against appellant for requesting the public documents because the recommendation to terminate his employment had already been made by Prysock via a memo to Dietrich dated April 10, 2009, based on appellant's admitted violation of the socialization/fraternization policy.

**{¶81}**  Finally, if the evidence indicates that an employer "would have made the same employment decision regardless of the employee's participation in the protected activity, the employee cannot prevail." *Pulver v. Rookwood Highland Tower Investments* (Mar. 26, 1997), Hamilton App. Nos. C-950361, 950429.  The record is clear that

appellee would have made the same decision regardless of appellant's participation in the alleged protected activity (requesting a hearing and public documents) based on appellant's admission to violating the socialization/fraternization policy.

{¶82} Based on the foregoing, we find that the trial court did not err in granting appellee's Motion for Summary Judgment.

{¶83} Appellant's sole assignment of error is, therefore, overruled.

{¶84} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.

By: Edwards, J.

Farmer, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

JAE/d0228

[Cite as *West v. Fcility Governing Bd. of Stark Cty. Community Corrections* , 2011-Ohio-2951.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

AARON WEST                                     :
                                               :
    Plaintiff-Appellant            :
                                               :
                                               :
-vs-                                           :         JUDGMENT ENTRY
                                               :
FACILITY GOVERNING BOARD OF                    :
STARK REGIONAL COMMUNITY                       :
CORRECTIONS                                    :
                                               :
    Defendant-Appellee             :         CASE NO. 2010CA00212


For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.

_____

_____

_____

JUDGES