NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0057n.06

Case No. 25-3212

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>LAURA OBERGEFELL,<br><br>      Plaintiff - Appellant,<br><br>v.<br><br>FIRELANDS REGIONAL MEDICAL CENTER,<br>et al.,<br><br>      Defendants - Appellees.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>**FILED**<br>Jan 28, 2026<br>KELLY L. STEPHENS, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO<br><br>OPINION</td></tr>
</table>

Before: DAVIS, RITZ, and HERMANDORFER, Circuit Judges.

**RITZ, Circuit Judge.** Firelands Regional Medical Center ("FRMC") fired Nurse Practitioner Laura Obergefell as part of a reduction in force ("RIF") during the COVID-19 pandemic. Obergefell claims that her age, and not the RIF, was FRMC's true motive for her termination. She sued FRMC for age discrimination under federal and state law, and for wrongful discharge, fraud and misrepresentation, and intentional infliction of emotional distress under state law. The district court granted summary judgment to FRMC on all claims. Because Obergefell did not offer sufficient evidence to create a jury question on any of her claims, we affirm.

**BACKGROUND**

I. **Facts**

Laura Obergefell worked as a full-time nurse practitioner ("NP") at the FRMC Wound Care Center ("WCC") in Sandusky, Ohio, from 2008 until her termination in 2020. At the time of her termination, Obergefell was 58 years old.

Obergefell's age discrimination claims rest primarily on the actions of defendant Tonia Copsey, the director of nurses at the WCC. Obergefell argues that Copsey was "lying in wait" for an excuse to fire her in favor of a younger NP and that Copsey used FRMC's pandemic-era RIF as pretext for Obergefell's discriminatory termination. CA6 R. 30, Appellant Br., at 11-13.

Copsey did in fact reference age and retirement around Obergefell. For example, Copsey openly discussed a hiring plan for Jenna Molnar, a 29-year-old nurse. Molnar had worked as a part time registered nurse ("RN") at the WCC since 2016. When Molnar graduated from NP school, Copsey advocated for her to be hired at the WCC permanently, calling her a "young star" who could "come in and help out." RE 53, Moore Dep., PageID 1582. Copsey told staff, including Obergefell, that "[w]hen [Molnar] finishes NP school, I'm going to hire her." RE 51, Pl.'s Dep., PageID 1226. When Obergefell asked "what [the WCC would] do with three NPs," Copsey replied that she would "need somebody to replace [Obergefell] when [she] retire[d]." *Id.* Obergefell said, "I don't know how old you think I am, but I still have a few more years." *Id.* In response, Copsey explained that she "need[ed] to get somebody in this job so when [Obergefell] retire[d]," the person would "know what they are doing" and Copsey could "leave the Wound Care Center in basically . . . good shape." *Id.*

Although Copsey advocated for FRMC to hire Molnar, she did not have the independent power to create new positions (like a third full-time NP role). But in fall 2019, FRMC hired Molnar as a part-time NP with Copsey's support. Molnar's contract gave her four hours of NP work per week, with the rest of the time spent as an RN.[1] Obergefell purportedly knew that "Molnar was

---

[1]   Molnar received an employment contract for her part-time role. Because Obergefell did not have a contract at the time of Molnar's hiring, Copsey "was fighting to get [Obergefell] her contract." RE 52, Copsey Dep., PageID 1509. In fact, Obergefell's contract was sitting on in-

unhappy with her contract because she wanted to work full time as a Nurse Practitioner." RE 1, Compl., PageID 7. But Copsey assured FRMC in-house counsel Robert Moore that Molnar's role was primarily an RN position; Molnar's four hours of NP work were "to be . . . backing up [Obergefell] and backing up [Copsey]." RE 53, Moore Dep., PageID 1594. In paperwork supporting Molnar's hiring, Copsey claimed that Molnar's new role was "the most likely to be subject to" any future layoffs. RE 110-6, Molnar Hiring Questionnaire, PageID 2976. She further indicated that "[Copsey and Obergefell] would need to stay" at full-time status, but "[l]ooking to the future," the WCC would need to fill a second NP role when Obergefell retired "within the next 8 years or so." *Id.* At that time, Copsey added, Molnar could be moved into the full-time NP role, thus allowing FRMC to "retain[] a valued hospital employee." *Id.*

Copsey assured Obergefell that her job was safe and not threatened by Molnar's new role. And Copsey never asked Obergefell when she intended to retire. Between 2016 and 2019, Copsey frequently gave Obergefell glowing performance reviews for her "outstanding" work and made comments like "I look forward to working with you for many years to come." RE 51, Pl.'s Dep., PageID 1139.

Then came the COVID-19 pandemic. Prior to the pandemic, FRMC already faced serious financial difficulty. The WCC was particularly unprofitable, losing nearly $500,000 in each of the two years preceding the pandemic. Moreover, WCC labor costs during both years were the highest they had been in a decade. The pandemic only exacerbated the problem. With resources diverted towards the COVID-19 response, FRMC ended all elective surgeries, the hospital's "bread and butter." RE 53, Moore Dep., PageID 1555. By April 2020, FRMC had lost about $5 million.

---

house counsel Robert Moore's desk for finalization when "the pandemic hit and everything got . . . wiped out." RE 53, Moore Dep., PageID 1596.

Because of low patient volume, "Obergefell was primarily performing non-billable tasks outside the scope of her [NP] role." RE 115-2, Meisler-McKillips Decl., PageID 3622. And even with Molnar on maternity leave from April to July 2020, Copsey alone "had the capacity to absorb what little billable [NP] work" remained. *Id.*

In early April, FRMC President and CEO Jeremy Normington-Slay emailed all FRMC personnel, assuring them that FRMC was "working diligently to not implement any permanent layoffs during this time." RE 110-21, Normington-Slay Email, PageID 3306. But that was not entirely true. Although Normington-Slay was the "face of the [FRMC] community" who had to make sure that his employees thought that "[e]verything was going to be great," FRMC's financial reality was far bleaker. RE 53, Moore Dep., PageID 1589. So FRMC management began to discuss a RIF and other cost-saving measures. And after considering every revenue stream "under the sun" for budget cuts, FRMC made the difficult decision to implement permanent layoffs. *Id.* at 1588.

Copsey and Human Resources Vice President Jody Meisler-McKillips "review[ed] the staffing needs of the WCC." RE 115-2, Meisler-McKillips Decl., PageID 3622. They determined that the "level of available billable work for [NPs] did not justify continuing to pay the salaries of two full-time" NPs, especially because Obergefell's salary was higher than that of "any other employee in the WCC." *Id.* Copsey initially proposed eliminating Obergefell's position for cost savings and because Copsey herself could absorb all of Obergefell's little remaining work. But Copsey also expressed discomfort at the idea of Obergefell being terminated. She explained that her "heart and head [would not] agree on what to do," so she instead proposed reducing Obergefell to an 18-hour-per-week schedule. RE 52, Copsey Dep., PageID 1409. FRMC rejected Copsey's proposed reduced schedule for Obergefell, and although it "explored other options short of

termination," FRMC ultimately made the "business decision" that the "second full-time [NP] position in the WCC could be eliminated entirely without adversely impacting WCC operations." RE 115-2, Meisler-McKillips Decl., PageID 3622.

FRMC eliminated Obergefell's position and terminated her employment on April 27, 2020. Obergefell was one of twenty employees eliminated in FRMC's pandemic-era RIF. The employees ranged from ages 22 to 68 with an average age of 45.5 at termination, meaning that 55% were in the protected age class of people over 40 years old. The average age of all FRMC employees was 43.2 before and after the RIF. Molnar returned from leave in July 2020 and resigned from her part-time role at the WCC in December 2020 due to low patient volume and insufficient work.

## II.     Procedural history

After her termination, Obergefell filed a charge of discrimination with the EEOC. Obergefell then sued FRMC for age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (ADEA) and Ohio Revised Code § 4112.02(A). She also sued individual FRMC employees for aiding and abetting age discrimination, a derivative claim of the same state statute. *See* Ohio Revised Code § 4112.02(J). Obergefell sued FRMC for wrongful discharge, alleging breach of an implied contract and promissory estoppel. She sued all defendants under Ohio law for fraud and misrepresentation and intentional infliction of emotional distress. After discovery, Obergefell filed a partial motion for summary judgment on her discrimination, aiding and abetting, fraud and misrepresentation, and intentional infliction of emotional distress claims. Defendants filed a motion for summary judgment on all claims.

The district court granted the defendants' summary judgment motion and denied Obergefell's motion. The court concluded that Obergefell had presented insufficient evidence for a reasonable jury to find in her favor on any of her claims. The court also reasoned that there was

"no genuine dispute that the COVID-19 pandemic caused financial hardship to FRMC, which required it to make difficult decisions" like terminating longtime, "exemplary" employees like Obergefell. RE 133, Mem. Op. & Order, PageID 3801. Obergefell appeals.

## ANALYSIS

### I.      Standard of review

We review a district court's grant of summary judgment de novo. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 805 (6th Cir. 2020). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "present sufficient evidence to permit a reasonable jury to find in its favor." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014). When evaluating a summary judgment motion, "[w]e must view all of the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in the nonmoving party's favor." *Willard*, 952 F.3d at 805-06. But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### II.     Obergefell's age discrimination claims

Obergefell claims that the district court erred in granting summary judgment to FRMC because she established a prima facie case under the ADEA and Ohio's age discrimination laws.

The ADEA prohibits employers from terminating an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff can offer direct or indirect evidence to establish a prima facie age discrimination claim, but "[n]o matter the type of evidence presented, the plaintiff retains the burden of persuasion to demonstrate 'by a preponderance of the

evidence . . . that age was the 'but-for' cause of the challenged employer decision.'" *Willard*, 952 F.3d at 806 (second alteration in original) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). In other words, the plaintiff must use direct or indirect evidence to show that "age was *the* determinative reason they were terminated." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). "[T]he elements and burden of proof in a[n Ohio] age-discrimination claim parallel the ADEA analysis," so Obergefell's federal and state discrimination claims rise or fall together. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998). Obergefell argues that she can establish a prima facie case using direct, indirect, and statistical evidence. We begin with Obergefell's direct evidence.

## A.     Direct evidence

Obergefell asserts she has "proved her age discrimination claim based on direct evidence." CA6 R. 30, Appellant Br., at 19. Her proffered direct evidence consists of Copsey's statements that she planned to hire Molnar to replace Obergefell after Obergefell retired; Copsey's 2019 assurances to FRMC that Molnar's role was most likely to be subject to any future layoffs; Copsey's statement that "Obergefell[] will be retiring within the next eight years or so, and [Copsey] will need to fill that spot with another NP"; and her description of Molnar as a "young star" who could "come in and help out." *Id.* at PageID 20-21.

Direct evidence "proves the existence of a fact without requiring any inferences." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)), *overruled on other grounds by Gross*, 577 U.S. at 180. The plaintiff must offer evidence that shows "both a predisposition to discriminate and that the employer acted on that predisposition." *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014). To determine "the materiality of allegedly discriminatory statements," *Pelcha*,

988 F.3d at 325, we may consider non-dispositive factors like whether the statements were: (1) "made by a decision-maker," (2) "related to the [termination] process," (3) "more than merely vague, ambiguous[,] or isolated remarks," and (4) "made proximate in time to the act of termination," *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 527 (6th Cir. 2012) (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002)). But the test is a "high bar." *Pelcha*, 988 F.3d at 325. For example, we have held that referencing "retirement does not necessarily refer to someone's age." *Id.* (quoting *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) (finding that the statement "retire and make everybody happy" was not direct evidence of age discrimination)). And we have held that a desire to "attract young people . . . says *nothing* about terminating older employees." *Miles v. S. Cent. Hum. Res. Agency*, 946 F.3d 883, 896 (6th Cir. 2020).

Obergefell cannot establish age discrimination using her proffered direct evidence. Each of Copsey's statements requires additional inferential steps to prove that she had "a predisposition to discriminate" against Obergefell *and* that she "acted on that predisposition." *Scheick*, 766 F.3d at 530. Although Copsey was certainly a "decision-maker" in Obergefell's termination, none of Obergefell's proffered statements related to FRMC's decision to fire her from the WCC. *Diebel*, 492 F. App'x at 527. And Copsey was not the sole decision-maker in Obergefell's termination. *See Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 581 (6th Cir. 2022) (declining to find discrimination where "multiple persons with various degrees of influence participated in the ultimate [termination] decision"). Rather, the record shows that Copsey tried to find an alternative way to safeguard Obergefell's employment during the RIF, but FRMC management above Copsey's head decided to proceed with the termination. Copsey never asked Obergefell to retire and never made any direct comments about age or infirmity when discussing Molnar's hiring plan, so mere reference to Obergefell's eventual retirement does not prove discrimination. *Pelcha*, 988

F.3d at 325. Perhaps most glaringly, Obergefell fails to meaningfully grapple with the significant intervening force of a pandemic that compelled FRMC to make financial decisions that would have been unforeseeable when Copsey made the above statements in 2019.

Obergefell's proffered direct evidence would require jurors to assume that Copsey's statements showed animus against older workers—a position not supported by our caselaw—and then make the additional inference that her animus, rather than the financial crisis of the pandemic, eventually led Copsey to suggest Obergefell's role for elimination. Then, jurors would have to infer that FRMC terminated Obergefell based on Copsey's recommendation alone. The statements Obergefell presented thus require too many inferences to constitute direct evidence. *See Blair*, 505 F.3d at 523.

## B. Indirect and statistical evidence

Obergefell also claims that she can establish a prima facie case using indirect and statistical evidence.

### 1. Indirect evidence under *McDonnell Douglas*

Absent direct evidence, an ADEA plaintiff may use circumstantial evidence to establish a prima facie age discrimination case under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1464 (6th Cir. 1990). To create a prima facie case under *McDonnell Douglas*, the plaintiff must show that she was: (1) a "member of a protected class (older than 40 years old)," (2) subject to an "adverse employment action," (3) "qualified for the position" from which she was terminated, and (4) "replaced by a someone outside of the protected class," or that a similarly-situated employee outside the class was treated more favorably. *Pelcha*, 988 F.3d at 326. But in cases involving RIF terminations, we raise the bar for the fourth requirement: an ADEA plaintiff fired during a RIF

must present "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 420 (6th Cir. 1999) (quoting *Barnes*, 896 F.2d at 1465).

As circumstantial evidence of age discrimination, Obergefell offered the same statements she offered as direct evidence. She also offered additional circumstantial evidence, as follows: (1) when Obergefell asked if she could reduce her hours or take a leave of absence instead of a full termination, Moore rejected her alternatives in violation of FRMC's Reductions in Force and Severance Pay Policy and Normington-Slay's April all-staff email; (2) Moore admitted he could have offered Molnar's RN position to Obergefell but "did not want to insult her by relegating her to a staff nursing job," RE 53, Moore Dep., PageID 1599-1602; (3) Copsey created "flexible" positions for younger WCC employees like Molnar but not for Obergefell, RE 52, Copsey Dep., PageID 1404-05; (4) Copsey ensured that Molnar had an employment contract but did not acquire one for Obergefell; (5) Moore treated a younger WCC employee, secretary Kelly Kilgore, better than Obergefell because he helped find Kilgore another secretarial job; and (6) Obergefell had superior qualifications to Copsey and Molnar because she was the only NP qualified to treat children. CA6 R. 30, Appellant Br., at 24-26. We conclude that none of Obergefell's circumstantial evidence supports a prima facie age discrimination case.

First, Copsey's comments, offered as direct evidence of age discrimination, also do not suffice as circumstantial evidence of age discrimination. After all, none of Copsey's comments were made in connection with Obergefell's termination. *See Pelcha*, 988 F.3d at 327 ("Allowing [infrequent, ambiguous comments about age] to create a jury question would essentially mean that any potentially ageist comments, about any employee, at any time, so long as made by the same person who made the [termination] decision . . . would suffice to get past summary

judgment . . . . That is not reasonable." (quotation omitted)). As the district court explained, Copsey's remarks "discussed Obergefell's eventual, not impending, retirement in the context of succession planning and made no suggestion that Obergefell *should* retire because of her age or for any other reason." RE 133, Mem. Op. & Order, PageID 3785. We are inclined to agree with the district court that "[w]ithout more, these retirement-related remarks do not carry a discriminatory motive." *Id.*; *see Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247-48 (6th Cir. 1997). And, like all her relevant statements, Copsey's assurance to FRMC that Molnar would be most likely to be subject to future layoffs was made prior to the pandemic. RE 110-6, Molnar Hiring Questionnaire, PageID 2976. The pandemic massively and unforeseeably disrupted FRMC's financial situation and dramatically decreased the WCC's available workload. Connecting Copsey's 2019 statement to FRMC's post-pandemic RIF is illogical under these circumstances.

We move next to the evidence that Moore declined to offer Obergefell an RN position or otherwise accommodate her but helped Kilgore secure a new secretarial role during the RIF. Moore did not discuss Obergefell's age in any way when explaining his decision not to offer her an alternative role at FRMC. Rather, Moore stated that he did not want to "insult" Obergefell after her years of study and experience by offering her a "demotion" and "one-tenth of [her] NP salary." RE 53, Moore Dep., PageID 1600, 1602. Moore explained that in his experience with human resources, "provid[ing] other opportunities that may be a demotion . . . generally comes back to bite you." *Id.* at 1600. Moore's choice not to offer Obergefell alternative, inferior employment is most logically read to derive from his respect for her experience and seniority at the WCC. And in any event, "an employer has no duty under [the] ADEA to permit an employee to transfer to another position . . . when the employee's position is eliminated as part of a work force reduction."

*Barnes*, 896 F.2d at 1469. So Moore's decision not to seek alternative employment for Obergefell was not inappropriate.

Relatedly, Obergefell claimed that Moore "treated the younger [WCC] secretary Kelly Kilgore better than [her]" because he found Kilgore alternative employment at FRMC. CA6 R. 30, Appellant Br., at 25-26 (citing RE 51, Obergefell Dep., PageID 1248). "Although an employer is under no obligation to transfer" an employee "whose position has been eliminated," the employer cannot refuse to transfer the plaintiff but agree to transfer similarly-situated younger employees "because of age discrimination." *Ercegovich*, 154 F.3d at 351. FRMC points out that "Obergefell cites no Rule 56 evidence demonstrating either that Ms. Kilgore is younger [than Obergefell] or that Mr. Moore 'found her a job.'" CA6 R. 31, Appellee Br., at 25. But even accepting Obergefell's unsupported statement on summary judgment review, her claim about Kilgore still does not allow her to meet her evidentiary burden. As the district court noted, Obergefell must show that she was "subjected to different treatment than persons similarly situated in all relevant aspects." *Ercegovich*, 154 F.3d at 352 (quoting *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995)). But Kilgore and Obergefell were not similarly situated. Kilgore was a front-desk secretary, not a nurse of any kind. In *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1997), we explained that to be "similarly situated," a plaintiff must identify individuals who "dealt with the same supervisor, have been subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct." *Id.* at 583. Obergefell does not allege that her NP role was similar to Kilgore's secretarial role in conduct, responsibilities, or standards. She thus cannot compare herself to Kilgore as a "similarly situated" individual who received preferential treatment for her age.

We dispose quickly of Obergefell's evidence that Copsey created "flexible" positions for younger WCC employees but not for Obergefell and that Copsey acquired an employment contract for Molnar but not Obergefell. As a preliminary matter, Copsey did not have the power to "create" positions at all. RE 53, Moore Dep., PageID 1591. Moreover, each of the three younger WCC employees who Obergefell alleges received the "flexible" positions—including Jenna Molnar— were already employed as part-time RN care coordinators prior to the pandemic and the resulting RIF. RE 115-2, Meisler-McKillips Decl., PageID 3621. There is no record evidence suggesting that their part-time RN positions were created in anticipation of the RIF or with the ultimate intention to oust or replace Obergefell. And none of these three part-time RNs even held the same position as Obergefell. They simply worked in the same office.

For similar reasons, we dispose of Obergefell's claim that Copsey tried to secure an employment contract for Molnar but not Obergefell. The record shows that Copsey *did* attempt to secure an employment contract for Obergefell, and that contract was on Moore's desk being finalized when "the pandemic hit and everything got . . . wiped out." RE 53, Moore Dep., PageID 1596.

Finally, we turn to Obergefell's argument that because she had superior qualifications to Copsey and Molnar—training to treat children—her termination is indirect evidence of age discrimination. A plaintiff can "establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff." *Barnes*, 896 F.2d at 1466. Obergefell's claim fails, however, because she was not "in the same position" as either Copsey or Molnar. *Id.* Molnar was a part-time RN who did a few hours per week of NP work to back up the full-time NPs. And while Copsey herself was a full-time NP at the WCC, she served the dual role of director of nurses at the WCC. Neither Copsey

nor Molnar held the "same position" as Obergefell. *Id.* So no reasonable juror could find that Obergefell's termination circumstantially evidenced age discrimination because of her additional credential.

### 2. Statistical evidence

Finding that neither direct nor circumstantial evidence allows Obergefell to establish a prima facie case of age discrimination, we turn to her statistical evidence. "Appropriate statistical data" showing discriminatory conduct toward members of a protected group "can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Barnes*, 896 F.2d at 1466. But to create an inference of discrimination, those statistics "must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018) (quoting *Barnes*, 896 F.2d at 1466). And appropriate sample size and adequate explanation of data are important components of using statistical evidence to prove discrimination. "We have upheld inferences of discrimination where data are offered alongside analyses describing their statistical significance." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 526 (6th Cir. 2021). "[B]oth the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987) (quotation omitted).

Obergefell's proffered statistical evidence does not create an inference of discrimination. Obergefell points to evidence that 11 of the 20 employees fired in FRMC's RIF—55%— were in the protected age class, a "red flag" FRMC itself acknowledged during the RIF. RE 53, Moore Dep., PageID 1560. And she claims that the district court "unjustifi[ably]" preferred the defendant's statistics over her own. CA6 R. 30, Appellant Br., at 28. But Obergefell offered no

expert testimony or comprehensive analysis to show why her limited data create an inference of discrimination or eliminate the RIF as the reason for her termination. She cites the statistical analysis we undertook in *Barnes* to support her discrimination arguments but does not acknowledge that the significant statistical evidence in *Barnes* was prepared by two expert statisticians who created "reports analyz[ing] the termination patterns of the employees who were discharged during the force reduction." 896 F.3d at 1462. And she fails to meaningfully contend with the defendants' own rebuttal data, which showed that the average age of terminated FRMC employees was almost exactly the average age of FRMC employees in general, and that the average age of FRMC employees remained unchanged before and after the RIF.[2]

Furthermore, the majority of Obergefell's discrimination evidence centers on the actions of Copsey, who only participated in one single termination during the RIF: Obergefell's own. Obergefell does not explain how her proffered statistics about *all* FRMC's RIF terminations correspond to Copsey's own alleged animus. And that is especially pertinent because Obergefell repeatedly claims that Copsey's individual animus was the true reason for her termination. But "[i]ncomplete or inapplicable analyses[ or] simplistic percentage comparisons . . . produce statistical analyses with little probative value." *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir. 2008). Because Obergefell's data provides no serious "analys[is] describing their statistical significance," *Thompson*, 985 F.3d at 526, nor do they "eliminate the most common nondiscriminatory explanation[] for the disparity"—the unexpected RIF—

---

[2] As FRMC points out, the FRMC employees subject to the 2020 RIF ranged in age from 22 to 68, with an average age of 45.5. Prior to the RIF, the average age of all FRMC employees was 43.2, and the average age of the hospital's employees after the RIF was also 43.2

Obergefell cannot prevail on her discrimination claim using her statistical evidence, *Peeples*, 891 F.3d at 635 (quotation omitted).

***

None of Obergefell's proffered direct, circumstantial, or statistical evidence creates a genuine issue of material fact appropriate for a jury.[3] We therefore find that the district court did not err in granting FRMC summary judgment on Obergefell's ADEA claim or her parallel state discrimination claim.

### C. Pretext

Obergefell next argues that FRMC's "articulated reason" for firing her—the RIF—was pretext for its true discriminatory motives. CA6 R. 30, Appellant Br., at 28. But because Obergefell failed to establish a prima facie age discrimination case under the ADEA or Ohio law, we decline to reach her pretext arguments.

### III. Obergefell's Ohio law claims

Obergefell raises Ohio claims for aiding and abetting age discrimination, wrongful discharge, and fraud and misrepresentation. The district court did not err in granting summary judgment to FRMC on these state law claims.

---

[3]     Obergefell also argues that Copsey acted as FRMC's "'cat's paw' regarding their decision to terminate" her. CA6 R. 30, Appellant Br., at 12. Under the cat's paw theory, a plaintiff attempts to "hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Bledsoe*, 42 F.4th at 582 (quoting *Marshall v. The Rawlings, Co.*, 854 F.3d 368, 377 (6th Cir. 2017)). But because we do not find that Obergefell presented sufficient evidence of Copsey's age-based animus to create a jury question, we decline to reach her cat's paw theory.

###### A. Aiding and abetting discrimination

Arguing that she has established a prima facie age discrimination case, Obergefell resurrects her aiding and abetting age discrimination claim under Ohio Revised Code § 4112.02(J). FRMC responds that we should not reach Obergefell's state age discrimination claim because she also filed an administrative discrimination claim with the EEOC, barring her from pursuing additional remedies in court. CA6 R. 31, Appellee Br., at 37-38 ("A plaintiff's 'unqualified administrative filing operates as a choice of remedy for Plaintiff, barring [a] state law age discrimination claim.'" (quoting *Russell v. City of Bellevue*, No. 3:20 cv 2859, 2021 WL 1517921, at *5 (N.D. Ohio Apr. 16, 2021))). We need not address, however, whether Obergefell's aiding and abetting claim is administratively barred. As the district court properly noted, because Obergefell did not establish a prima facie case of age discrimination under Ohio law, she cannot raise the derivative claim of aiding and abetting age discrimination. *See Schelle v. City of Piqua*, No. 24-3980, 2025 WL 1592135, at *6 (6th Cir. June 5, 2025) (citing Ohio caselaw for proposition that "claim for aiding and abetting unlawful discrimination under" § 4112.02(J) "fails as a matter of law when the plaintiff fails to establish the underlying discrimination claims.").

###### B. Wrongful discharge

Obergefell next argues that the district court erred when it accepted FRMC's at-will disclaimer defense against Obergefell's wrongful discharge claims. "Ohio has long recognized the employment-at-will doctrine," which allows either party to an at-will employment contract to "terminate the employment relationship for 'any reason which is not contrary to law'" at "any time." *Lunsford v. Sterilite of Ohio, L.L.C.*, 165 N.E.3d 245, 251-52 (Ohio 2020) (quoting *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 153 (Ohio 1985)). But Ohio recognizes two exceptions to the at-will employment doctrine: "actions involving promissory estoppel and breach of an

implied contract." *Id.* at 252. The parties do not dispute that Obergefell's employment was initially at-will. But Obergefell argues that FRMC wrongfully discharged her based on both implied contract and promissory estoppel, largely entwining her arguments about the two claims. We take each theory in turn and find that Obergefell failed to create a genuine issue of material fact on either.

### 1.     Implied contract

Obergefell first argues that FRMC altered her at-will employment status with promises of future job security, creating and violating an implied contract. In Ohio, a successful implied contract action demonstrates that some promise or action transformed the at-will employment relationship and altered the terms of discharge. *Wright v. Honda of Am. Mfg., Inc.*, 653 N.E.2d 381, 384 (Ohio 1995). To show the creation of an implied contract, the plaintiff must "prove the existence of each element necessary" for contractual formation: "offer, acceptance, consideration, and mutual assent." *Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538 (S.D. Ohio 2023) (quoting *Staschiak v. Certified Logistics*, 60 N.E.3d 824, 828 (Ohio Ct. App. 2016)).

In *Wright*, a plurality of the Ohio Supreme Court held that "to ascertain the explicit and implicit terms concerning discharge," courts and jurors could broadly review the "history of relations between the employer and employee" and the "facts and circumstances" surrounding the at-will relationship. 653 N.E.2d at 384. Citing *Mers*, the *Wright* court held that appropriate evidence included information contained in "employee handbooks," "oral representations" from supervisors, promises of job security, and "written assurances reflecting company policy." *Id.* Other Ohio courts, however, have cabined *Wright* to its facts. For example, in *Reasoner v. Bill Woeste Chevrolet, Inc.*, 730 N.E.2d 992 (Ohio Ct. App. 1999), an Ohio appeals court explicitly departed from *Wright*, explaining that *Wright* created a "slippery slope" to disrupt the at-will

presumption and joining a line of Ohio cases refusing to recognize *Wright*'s plurality opinion as law. *Id.* at 995. Instead, the court favorably quoted one of the *Wright* concurrences, noting that "inspirational orientation remarks, employee handbook platitudes, bright-eyed promotion letters, and complimentary progress reports . . . do not imply a contract between an employer and an employee." *Id.* (quoting *Wright*, 653 N.E.2d at 386 (Pfeifer, J., concurring)).

On appeal, Obergefell points to several pieces of evidence to support both her implied contract claim and promissory estoppel claim: (1) FRMC's Reductions in Force and Severance Pay Policy, which states that FRMC "strives to avoid reductions in workforce whenever possible" and that RIFs would "follow an orderly procedure" with guidelines to consider an employee's skills and abilities, performance evaluations, and length of service before termination; (2) Copsey's "representations of job security," including her promise that Obergefell's "job was safe" and statements on Obergefell's performance evaluations like, "I look forward to working with you for many years to come"; and (3) Copsey's assurances to FRMC administration that in the event of layoffs at the WCC, Molnar would be terminated first. CA6 R. 30, Appellant Br., at 37-38.

As the district court noted, an "employee's belief that [an employment handbook or policy] affords [her] contractual rights does not mean that it does unless the employer intends it to do so. As in all contracts, express or implied, both parties must intend to be bound." RE 133, Mem. Op. & Order, PageID 3792 (quoting *Clayton v. Cleveland Clinic Found.*, No. 101854, 2015 WL 1851517, at *2 (Ohio Ct. App. Apr. 23, 2015)). But when employee handbooks or policies explicitly disclaim the employer's intent to create a contract or alter an at-will employment relationship, there can be no inference of a new or implied contractual obligation. *See Hines*, 689 F. Supp. 3d at 538 (collecting cases). And here, Obergefell neglects to acknowledge such language in the annual employment agreements she signed, which warned that FRMC's "Human Resources

[policies] are subject to change . . . [and are] not intended to be, nor should [they] be[,] regarded as an employment contract." RE 113-8, Annual Acks. 2019-2020, PageID 3558-60. The policies also stated that "[a]bsolutely no one except the President and Chief Executive Officer may change [the at-will employment] relationship, and then only in writing." *Id.* at 3559. In other words, FRMC's policies explicitly disclaimed an intent to modify Obergefell's at-will status and imposed heightened requirements on employees attempting to alter their employment status. Moreover, Obergefell signed these policies annually from 2010 through 2019, repeatedly acknowledging her own at-will status.

Because FRMC's handbook policies included explicit language disclaiming any modification of the at-will relationship, and because none of Obergefell's alleged statements of job security were made in writing from FRMC's president or CEO, no reasonable juror could find that FRMC created an implied employment contract with Obergefell. Nor did she offer evidence that any party believed that her at-will status had changed. The district court did not err in dismissing her implied contract claim.

### 2. Promissory estoppel

Obergefell also alleges wrongful discharge under the doctrine of promissory estoppel. Promissory estoppel applies where an "employer makes representations or promises of continued employment" on which an employee relies. *Casale v. Nationwide Children's Hosp.*, 682 F. App'x 359, 363 (6th Cir. 2017) (citing *Wright*, 653 N.E.2d at 384). To succeed on a promissory estoppel claim, a plaintiff must establish "(1) a clear and unambiguous promise" by her employer; "(2) [her] reliance on the promise; (3) that the reliance was reasonable and foreseeable; and (4) that [she] was injured" because of that reliance. *Id.* at 366 (citing *Dunn v. Bruzzese*, 874 N.E.2d 1221, 1227 (Ohio Ct. App. 2007)). In other words, "[t]he test . . . is whether the employer should have

reasonably expected its representation to be relied upon by its employee and, if so, whether the expect[ed] action or forbearance actually resulted and was detrimental to the employee." *Kelly v. Georgia-Pacific Corp.*, 545 N.E.2d 1244, 1250 (Ohio 1989). But that does not mean that any promise, praise, or insinuation from an employer results in an enforceable promise. Rather, to create an exception to the at-will presumption, the plaintiff must demonstrate "detrimental reliance on specific promises of job security." *Helmick v. Cincinnati Word Processing, Inc.*, 543 N.E.2d 1212, 1217 (Ohio 1989).

Obergefell offered the same evidence to support her promissory estoppel claim as she did to support her implied contract claim. And she argues that FRMC's disclaimer language "can be negated by representations of job security." CA6 R. 30, Appellant Br., at 40. Obergefell alleges that Copsey's frequent praise of her performance and Copsey's reassurances about job security represent a clear and unambiguous promise from FRMC to continue her employment. *Id.* at 38. We need not determine here, however, if Copsey's statements were a sufficiently clear promise, because Obergefell offered absolutely no evidence that she ever detrimentally relied on Copsey's promises. Although Obergefell claims that "[i]n reliance on [Copsey's] promise[s], [she] decided not to look for another job," she cites no evidence and provides no facts to show that she was seeking alternative employment or considering leaving the WCC, where she had worked since 2008, or that Copsey's representations induced her to stay in her job. *Id.* Indeed, when asked during her own deposition if she had "any information or personal knowledge" that Copsey knowingly lied when she told Obergefell that her job was safe, Obergefell responded that she "never believed [Copsey]." RE 51, Obergefell Dep., PageID 1269. If Obergefell herself did not believe Copsey's statements about her job security, those assurances almost certainly did not induce her to remain in her role.

Obergefell also relies on *DeSanzo v. Titanium Metals Corp.*, 351 F. Supp. 2d 769, 779 (S.D. Ohio 2005), where, according to her, the district court "relied on a similar promise to deny summary judgment for the employer" on a promissory estoppel claim. CA6 R. 30, Appellant Br., at 38-39. Like in Obergefell's case, the *DeSanzo* plaintiff's "at-will employment relationship was confirmed and memorialized by a written offer of employment." *DeSanzo*, 351 F. Supp. 2d at 777. But the *DeSanzo* plaintiff put forth evidence that he declined to join coworkers in returning to their union's bargaining unit because a supervisor told him "not to worry" about an impending RIF, because other employees who returned to the union *had* already been informed they were targeted for layoff, and because another supervisor refused to tell him that he had been targeted for termination in the RIF. *Id.* at 779. Based on these representations and the plaintiff's demonstrated reliance on them, the *DeSanzo* court refused to grant summary judgment to the employer on the plaintiff's promissory estoppel claim. *Id.* By contrast, Obergefell never received clear, unambiguous representations of job security during the pandemic or RIF, and she offered no evidence of actual reliance on any promises of job security. And as the district court noted, *DeSanzo* is also distinguishable because FRMC's employment acknowledgement forms—which Obergefell signed every year—warned that no one except FRMC's president and CEO could alter the at-will employment relationship, and then only in writing. No such qualification existed in the *DeSanzo* plaintiff's one-time employment letter. *Id.* at 773.

Obergefell offered no evidence that FRMC agreed to a modification of her at-will employment status, nor can she show that she detrimentally relied on any representations of job security involving FRMC's RIF. For these reasons, the district court did not err in granting summary judgment to FRMC on Obergefell's wrongful discharge claims.

### C.    Fraud and misrepresentation

Obergefell argues that Normington-Slay's April 2020 "Caring for our Associates during COVID-19" email constituted tortious fraud or misrepresentation in violation of Ohio law.  CA6 R. 30, Appellant Br., at 40.  But her argument, which consists of one paragraph copied from her motion for summary judgment, does not meaningfully address the reason the district court dismissed it: Obergefell "did not seek to amend her Complaint to . . . properly plead a claim of fraud" based on Normington-Slay's statement, so the statement was "not included within the scope of her properly-pled fraud claim" and she was "not entitled to summary judgment on [that] unpled claim."  RE 133, Mem. Op. & Order, PageID 3797 n.25; *see also* Fed. R. Civ. P. 9(b); *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007).  Because we do "not consider claims not properly raised below," we decline to assess Obergefell's fraud claim.  *Beaty v. United States*, 937 F.2d 288, 291 (6th Cir. 1991).

Even if Obergefell had properly pled her claim about Normington-Slay's alleged fraud in the district court, she makes no genuine attempt on appeal to apply the elements of a fraud claim or explain how she satisfied them.  She merely repeats, without evidence, that Normington-Slay's email was meant to "intentionally deceive[]" FRMC employees because he "did not want any employees to leave before the RIF," satisfying "the gist of a fraud or misrepresentation cause of action."  CA6 R. 30, Appellant Br., at 40; CA6 R. 32, Reply Br., at 20.  Where "issues are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," we consider them forfeited and decline to address them.  *Buetenmiller v. MaComb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (citation modified).

**D.      Intentional infliction of emotional distress**

Finally, Obergefell raised a tort claim for intentional infliction of emotional distress in the district court.  Her briefing makes no mention of this claim, so she has abandoned it on appeal. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

## CONCLUSION

For these reasons, we affirm the district court's grant of summary judgment to FRMC.